[No. 24919. Department Two. March 2, 1934.]

KITSAP COUNTY TRANSPORTATION COMPANY, *Respondent*, v. MANITOU BEACH-AGATE PASS FERRY ASSOCIATION *et al.*, *Appellants*.[1]

*Henry, Henry & Pierce* and *Hylas E. Henry*, for appellants.

*Philip D. Macbride, George W. Williams*, and *Byers & Byers*, for respondent.

BLAKE, J.—This action presents another chapter in the history of the problem of transportation between Seattle and Bainbridge Island.

[1]Reported in 30 P. (2d) 233.

For many years prior to the enactment of chapter 248, Laws of 1927, p. 382 (Rem. Rev. Stat., §§ 10361-1, 10361-2), the plaintiff had operated steamboats affording regular vehicular, passenger and freight service between Seattle and points on the island. Pursuant to the terms of that act, certificates of convenience and necessity were issued to plaintiff covering its operations between Seattle and the various points on the island to which its service extended. Subsequently, the rights under these several certificates were consolidated into one certificate issued by the department of public works. Prior and subsequent to the issuance of the certificates, plaintiff maintained only one vehicular ferry. This plied, on regular schedule, between Seattle and Port Blakely, which is located near the southerly end of the island.

The permanent population of the island is approximately three thousand, about one-third of whom reside in the northerly half of the island. A considerable number of the residents of the island, becoming dissatisfied with the vehicular ferry service, persuaded the Puget Sound Navigation Company to apply for a certificate of convenience and necessity for the installation of vehicular ferry service between Seattle and Manitou Beach, a point on the island about four miles north of Port Blakely. The department granted the application. Thereupon, Kitsap County Transportation Company, the plaintiff here, sought review of the department's order in this court. *Kitsap County Transportation Co. v. Department of Public Works,* 170 Wash. 396, 16 P. (2d) 828.

In that case, the court reversed the order of the department, holding that the certificate of convenience and necessity granted to the Puget Sound Navigation Company violated the rights of the plaintiff herein

under its certificate of convenience and necessity there-tofore issued. The court held that, even though the service rendered by plaintiff might be inadequate, a competing company could not be granted the right to enter the field until the department had determined the service was inadequate and the plaintiff had failed to improve the service after the department had ordered it to do so.

After that decision was rendered, the defendant Manitou Beach-Agate Pass Ferry Association was organized by some twenty "property owners, residents and taxpayers of Bainbridge Island." (This defendant will, for convenience, be hereafter referred to as the "ferry association.") The ostensible purpose was "to create a social, benevolent and charitable organization under the provisions of Rem. Comp. Stat., sections 3872 *et seq.*" The real purpose was to establish and maintain a vehicular ferry service between Seattle and Manitou Beach.

To that end, in January, 1933, the ferry association filed with the department of public works a petition asking that the department order Kitsap County Transportation Company to furnish ferry service between Seattle and Manitou Beach. On June 17, 1933, while that application was pending before the department of public works, the ferry association entered into a charter party with Puget Sound Navigation Company for the steam ferry "Quilcene." Pursuant to the terms of the charter, the "Quilcene" was delivered to the ferry association on June 24th. The ferry was scheduled to make ten round trips per day from Seattle to Manitou Beach. It had made three round trips on June 24th, when the service was interrupted by the issuance of a temporary restraining order out of the superior court of King county, on the complaint

of plaintiff herein. After answer, a trial was had, resulting in a decree permanently enjoining defendants from maintaining ferry service between Seattle and Manitou Beach. From the decree so entered, defendants appeal.

Appellants make eight assignments of error, which, for discussion, may be grouped under the following heads: (1) Constitutionality of the act (chap. 248, Laws 1927, p. 382, Rem. Rev. Stat., § 10361-1 *et seq.*); (2) extent of respondent's rights under its certificate of convenience and necessity; (3) rights of the ferry association and its members to maintain a ferry service.

█ Appellants contend that chapter 248, Laws of 1927, p. 382, is unconstitutional, in that (a) it permits a monopoly in violation of article XII, § 22, of the state constitution; (b) it grants special privileges and immunities in violation of article I, § 12, of the state constitution; (c) it denies appellants personal rights guaranteed by article I, § 3, of the state constitution and by the fourteenth amendment to the constitution of the United States.

The act is but an exercise of the power of the state, recognized and exercised from time immemorial, to control travel over and on its navigable streams and waters. *Mills v. County of St. Clair*, 49 U. S. 569; *Norris v. Farmers & Teamsters Co.*, 6 Cal. 590, 65 Am. Dec. 535; *The Charles River Bridge v. The Warren Bridge*, 36 U. S. 419, 9 L. Ed. 417. In the first case (p. 580), it is said that

"The establishment and regulation of ferries across navigable streams is a subject within the control of the government, and not matter of private right; and that the government may exercise its powers by contracting with individuals. We deem this general principle not open to controversy."

In the second case, the court says:

"At common law, no bridge or ferry could be erected so near another, bound by law to be provided with attendance, crafts, etc., so to draw away its profits. . . . The reason for this, as given by Mr. Blackstone, is that the owner of a ferry is bound by the public to keep it in repair and readiness for the use of the citizens, and that he cannot do if his franchise may be invaded, or if the income of the bridge or ferry may be curtailed by diverting passengers by means of a rival unauthorized establishment of a like kind. Therefore, although the public convenience is the occasion of granting franchises of this nature, and, for example, the ferry established on the road chartered is *publici juris,* yet the property is private, and consequently an injury to it may be the subject of an action, for no person could be expected to serve the public by bestowing his time, labor and money in establishing a ferry or erecting a bridge, if its value could be immediately destroyed by the caprice or malice of private persons, in adopting means of drawing away the custom to some establishment of their own."

In the third case, Mr. Justice Story, in a dissenting opinion, p. 607, said:

"No sound lawyer will, I presume, assert that the grant of a right to erect a bridge over a navigable stream is a grant of a common right. Before such grant, had all the citizens of the state a right to erect bridges over navigable streams? Certainly, they had not; and therefore, the grant was no restriction of any common right. It was neither a monopoly; nor, in a legal sense, had it any tendency to a monopoly. It took from no citizen what he possessed before; and had no tendency to take it from him. It took, indeed, from the legislature the power of granting the same identical privilege or franchise to any other persons. But this made it no more a monopoly, than the grant of the public stock or funds of a state for a valuable consideration."

Our own decision in *Kitsap Transportation Co. v. Department of Public Works, supra,* is declaratory

of this principle. In *State ex rel. Department of Public Works v. Inland Forwarding Corporation,* 164 Wash. 412, 2 P. (2d) 888, this court held valid, as against the constitutional objections raised here, chapter 111, Laws of 1921, p. 338 (Rem. Rev. Stat., § 6387 *et seq.*), relating to the issuance of certificates of convenience and necessity to carriers using the public highways.

But appellants contend that a certificate of necessity does not amount to a franchise to operate a ferry. Whether it be a franchise under conventional definitions of the word, we think immaterial. As was said by the supreme court of Montana, in *Willis v. Buck,* 81 Mont. 472, 263 Pac. 982, having under consideration a certificate to a carrier on state highways:

"Whether the certificate held by the plaintiff, Willis, be considered as a license, a permit or a franchise, it is essentially a species of property, the value of which is dependent upon the exclusiveness of the privilege conferred."

This court has repeatedly characterized such certificates to carriers on the highways as franchises, and has protected the owners thereof on the theory that such certificates constituted vested property rights. *Davis & Banker v. Nickell,* 126 Wash. 421, 218 Pac. 198; *Davis v. Clevinger,* 127 Wash. 136, 219 Pac. 845; *Davis v. MacKay,* 128 Wash. 333, 222 Pac. 491; *Chelan Transfer Co. v. Foote,* 130 Wash. 511, 228 Pac. 297; *Independent Truck Co. v. Wright,* 151 Wash. 372, 275 Pac. 726. Finally, in *Kitsap County Transportation Co. v. Department of Public Works, supra,* this court held this very certificate of convenience and necessity to be a right which could not be impaired through the granting by the department of public works of a certificate to a competing carrier, without first giving respondent an opportunity to furnish the required service.

But, say appellants, these decisions apply only to competing *common carriers;* that the ferry association is not a *common carrier.* The argument is that the association is operating a "club boat" for the convenience of "club members"; that no one but members, their families, their servants and guests can avail themselves of the privileges afforded by the "club boat"; that each member would have the right to transport himself, his family, servants and guests by means of his own rowboat or launch; that what each member would have the right to do as an individual is not unlawful when done by the members jointly.

Neither the device nor the argument is new. *Harrell & Croft v. Ellsworth,* 17 Ala. 576; *Weld v. Chapman,* 2 Ia. 524; *Warren v. Tanner,* 21 Ky. Law 1678, 56 S. W. 167; *Inhabitants of Peru v. Barrett,* 100 Me. 213, 60 Atl. 968, 109 Am. St. 494, 70 L. R. A. 567; *McInnis v. Pace,* 78 Miss. 550, 29 So. 835; *Stanley v. White,* 132 Ark. 617, 201 S. W. 804; *Norris v. The Farmers & Teamsters Co.,* 6 Cal. 590, 65 Am. Dec. 535; *Vallejo Ferry Co. v. Solano Aquatic Club,* 165 Cal. 255, 131 Pac. 864, Ann. Cas. 1914C, 1197. The two California cases last cited bear close analogy in their facts to the case at bar. In those two cases, the history of the rights of ancient and modern ferries is exhaustively reviewed. The franchise of the ancient ferry was exclusive, and its modern prototype is not less so. The reason for it has been stated in the quotation already taken from *Norris v. The Farmers & Teamsters Co., supra.* A more elaborate discussion is contained in *Vallejo Ferry Co. v. Solano Aquatic Club, supra* (p. 265), from which we take the following:

"Ferries are established primarily for the convenience of the people. It is the duty of the government, which has thus invited private capital to aid in the comforts and conveniences of its citizens, to safeguard

the rights which it had bestowed, and to see that the enjoyment of those rights is coextensive with the grant of them. . . .

"Support for appellant's asserted right to do what it is doing, regardless of the validity of respondent's franchise, is sought to be found in the principle that, notwithstanding the existence of a bridge or ferry franchise, (1) a man may, in his own boat, transport his family, his goods, and his servants; . . . As to the first of the propositions, the courts have with promptness and severity frowned down upon any extension of the common-law rule permitting a man, regardless of the existence of a ferry franchise to transport himself, and his household, including his servants. The courts have held that the ancient rule was and is based upon the fact that such transportation by the owner of a boat would constitute such slight interference with the franchise rights as to amount to *dammum absque injuria* (*Hunter v. Moore,* 44 Ark. 184, 51 Am. Rep. 589), but that an extension of the rule manifestly would lead to unwarranted injurious results. No concert of action nor community of interest has been held sufficient to warrant such an invasion of franchise rights. . . . In all these cases will be found the same effort to extend the rule under various forms of subterfuge and evasion. . . . A ferry franchise emanating from the supreme power of the state or its authorized mandatories is a grant to a named person empowering him to continue an interrupted land highway over the interrupting waters. As the care and control of the highways are vested in the sovereignty, so also is this right to say who shall purvey for the public in the matter of the water highway. . . . So here, the one man rowing his boat within the limits of the ferry franchise exercises a personal right and his act as to the ferry company is *dammum absque injuria.* Let a thousand or two thousand men in combination propose to buy boats and operate them for their common use and convenience, then the right of one man, which he may unquestionably exercise alone, has by combination been converted into an unwarranted ferry system for the many."

In that case, as in this, a considerable number of people employed by the government at the Mare Island Navy Yard formed the Solano Aquatic Club, with declared purposes similar to appellants' in this case. The primary and obvious purpose of the organization was the transportation of its members between Vallejo and Mare Island, between which points the ferry company was running a regular ferry service under a franchise from duly constituted authorities. As indicated by the portion of the opinion we have quoted, the court enjoined the club from engaging in a service that was, in fact, competitive with that of the ferry company.

Judged by similar standards, the appellants in this case must be enjoined from operating a ferry service between Seattle and Manitou Beach. For it is quite obvious from the record that such service is the primary, if not the sole, purpose for which the ferry association was organized. It was without substantial assets. Its membership fee was nominal—one dollar per year; and, for all practical purposes, membership or its privileges were open to all who might desire transportation between Seattle and Bainbridge Island. It entered into a charter party obligating itself to pay $7,500 per month for the use of the ferry "Quilcene," which was delivered to the association by the owner, Puget Sound Navigation Company, fully equipped, manned and victualled, and commanded by a captain designated by the owner. The termini of its run on both shores were at docks provided by and owned by Puget Sound Navigation Company. It was put in operation on a regular schedule of ten round trips daily. Passage was provided for at fixed rates.

The charter party was for three months duration, commencing in June. During the summer, the population of Bainbridge Island is augmented manyfold by the accession of summer residents. By reason of such

increase in population, the revenues of respondent are two or three times as great as in the corresponding winter months. While the charter party provided that the ferry association should employ pursers to sell tickets and collect fares, it is quite apparent that, stripped of pretense, the transaction was one whereby the Puget Sound Navigation Company was to furnish the boat and the ferry association was to furnish the passengers.

The revenues of the ferry association derived from membership fees would not pay a tenth of the obligation the association assumed for the use of the boat under the terms of the charter party. The association itself had no financial responsibility, and, under its articles of incorporation, its members assumed none. So it is apparent that both the ferry association and the Puget Sound Navigation Company expected the revenues to be derived from the carriage of vehicles and passengers to be sufficient to defray the obligation assumed by the ferry association under the charter party.

These revenues, in the absence of competition, would go to the respondent. Without them, the respondent would undoubtedly suffer a loss in the operation of its service between Seattle and Bainbridge Island. Ultimately, the consequence of that would be to bankrupt the respondent and force it to relinquish its rights under its certificate of convenience and necessity. But, ask appellants, is that a sufficient reason to enjoin the service proposed by them between Manitou Beach and Seattle? On the record presented here, it is.

The basic difficulty, as we read the record, is that the revenues of traffic between Seattle and Bainbridge Island are not sufficient to support the kind of transportation desired by appellants. It appears from the record that respondent has at all times endeavored to

keep its service abreast of the demands of traffic, and we think has succeeded in doing so. As recently as 1928, respondent put a new ferry in service, at a cost of one hundred fifty thousand dollars. To establish the service desired by appellants would require an initial outlay of two hundred thousand dollars. This, the revenues from the traffic would not warrant. To allow a competitor to enter the field, would be to encourage ruinous competition which would be not only destructive of respondent's rights under its certificate of convenience and necessity, but inimical to the best interests of the traveling public at large.

Judgment affirmed.

GERAGHTY, TOLMAN, and STEINERT, JJ., concur.

BEALS, C. J., concurs in the result.