[No. 27086. Department Two. February 8, 1939.]

THE STATE OF WASHINGTON, *on the Relation of the Country Club of Seattle, Appellant,* v. THE DEPARTMENT OF PUBLIC SERVICE *et al., Respondents.*[1]

[1]Reported in 86 P. (2d) 1104.

*Lewis, Black & Ghormley* and *Evans, McLaren & Littell*, for appellant.

*The Attorney General, Don Cary Smith, Assistant, Frederick J. Lordan, Will M. Derig, W. E. McCroskey,* and *Bogle, Bogle & Gates,* for respondents.

ROBINSON, J.—This cause involves the validity of an order of the department of public service regulating water transportation between Bainbridge island and Seattle. That intricate and complex problem has, in some form or other, been before the regulatory body almost continuously for more than six years, and phases of it have been before this court on several previous occasions. Broadly speaking, the order complained of substitutes, for the former system consisting of a vehicular ferry running to and from Port Blakely and supplemented by coastal boats, a vehicular ferry running out of Eagle Harbor, supplemented by a regular bus service connecting the ferry terminus with all parts of the island, the bus service to be continuously maintained by the ferry company as an integral part of its transportation system.

Bainbridge island lies about eight miles west of Seattle, and is about ten miles in length by three in average width. It has a permanent population of about three thousand, and at least double that number during the summer season. The appellant country club owns an extensive tract of land, the southeast corner of the island, acquired about 1890. About fifteen families have residences on the tract, and six or seven of them reside there the year round. The tract is highly developed, the improvements being valued in excess of a quarter of a million dollars. These consist of a number of very substantial residences, a self-contained water system, a golf course, and the other recreational facilities usually appurtenant to a country club. The

country club tract is bounded on the north by Port Blakely, a narrow indentation which extends into the island for something more than a mile. From this point, there has been some sort of water transportation to and from Seattle since 1865. The country club has maintained its own dock on the south shore of the bay for upwards of forty-five years.

A vehicular ferry began to run from Seattle to Port Blakely, a little settlement on the north shore of the bay, about fifteen years ago, and such service was practically continuous until the questioned order became effective. This ferry stopped at the country club dock to take on or discharge foot passengers. The fact that Port Blakely bay was so long the center of the vehicular ferry service, had its natural effect upon the planning and maintenance of the island roads. The roads leading from Port Blakely are wider and safer than those leading from Eagle Harbor, and have fewer sharp grades.

The country club dock was also used by the residents of the south shore of the island, particularly by the residents of South Beach. Of these, there are about thirty families during the summer, and, perhaps, a fourth of them live on the island the year round. Having no road connections, they walked to the country club dock, a distance of about a mile.

About two miles north of Port Blakely bay, another indentation extends into the island, called Eagle Harbor. Here, on the north side and near the entrance is Wing Point; Creosote is on the south shore; farther in is Hawley on the north shore; and Eagledale on the south. The old settlement of Winslow is still farther to the west on the north shore.

About two miles north, and about the center of the eastern side of the island, is Rolling Bay, another indentation, with a considerable settlement at Manitou

Beach and other neighboring points. Port Blakely, Eagle Harbor, and Manitou Beach are all suitable for the accommodation of ferry service and are about equi-distant from Seattle, the distance being 8.1 miles, 8.4 miles, and 8.6 miles, respectively.

Port Madison is situated on a bay running in from the north shore of the island. At the extreme north end is Agate Beach. On the western side are Crystal Springs, Fletcher Bay, Venice, Manzanita, and Seabold. These points on the north and west shores formerly enjoyed a considerable service by boat. With the development of the Port Blakely ferry and of stage service on the island, a great deal of time was saved by crossing the island by stage, or private automobile, and taking the ferry at Port Blakley or a boat at Eagle Harbor or Manitou Beach.

The center of population is a little south of the center of the island, being something like a mile north and a little west of Eagle Harbor.

Prior to the passage of chapter 248, Laws of 1927, p. 382 (the certificate of necessity act), the Kitsap County Transportation Company (hereinafter called the Kitsap company) had been operating vessels on the Bainbridge island and contiguous mainland routes. It was granted six certificates of necessity, which were, in 1928, consolidated in steamboat certificate No. 1. This certificate did not provide for ferry services to Manitou Beach.

In September, 1931, the Puget Sound Navigation Company applied to the department of public works, now the department of public service, for a certificate authorizing it to furnish a ferry service between Seattle and Manitou Beach. After a hearing, the application was granted, and the navigation company built a ferry dock at Manitou. The matter finally came to this court on a writ of certiorari, and that certificate was quashed. *Kitsap County Transportation Co. v. Depart-*

*ment of Public Works,* 170 Wash. 396, 16 P. (2d) 828. It is interesting to note that the court, in this opinion, suggested that the Kitsap company might, perhaps, be required to establish a ferry to Manitou Beach, and added:

"It may also be that the Kitsap company should be required to extend or change its vehicle ferry service to and from the island to some other route or routes of higher public necessity than the Seattle-Manitou Beach route, or even than the Seattle-Port Blakely route."

In January, 1933, the Manitou Beach-Agate Pass Ferry Association, an organization of residents of the north part of the island, petitioned the department to order the Kitsap company to establish ferry service between Seattle and Manitou Beach, and across Agate pass. While its petition was pending in the department, the association resorted to self-help by chartering a ferry boat to make ten round trips per day between Seattle and Manitou Beach. It had made three round trips when the service was stopped by a restraining order, on complaint of the Kitsap company that it constituted an infringement upon the rights granted in its certificate. This court upheld that contention in *Kitsap County Transportation Co. v. Manitou etc. Ass'n,* 176 Wash. 486, 30 P. (2d) 233, and, in doing so, said, of the island problem:

"The basic difficulty, as we read the record, is that the revenues of traffic between Seattle and Bainbridge Island are not sufficient to support the kind of transportation desired by appellants. It appears from the record that respondent has at all times endeavored to keep its service abreast of the demands of traffic, and we think has succeeded in doing so. As recently as 1928, respondent put a new ferry in service, at a cost of one hundred fifty thousand dollars. To establish the service desired by appellants would require an initial outlay of two hundred thousand dollars. This, the

revenues from the traffic would not warrant. To allow a competitor to enter the field, would be to encourage ruinous competition which would be not only destructive of respondent's right under its certificate of convenience and necessity, but inimical to the best interests of the traveling public at large."

After a long hearing, the petition of the association that the department require the Kitsap company to establish ferry service to Manitou Beach, was denied, but some additional service was ordered on August 5, 1933, in department cause No. 6581. That order was obeyed until November 7, 1935, when a strike shut down most of the service until December 13th, upon which date the company reestablished a part of the service only.

The instant proceedings were instituted in cause No. 6906, by an order issued in January, 1936, requiring the Kitsap company to show cause why it was not maintaining the service ordered in cause No. 6581. In the first hearing, which was held in February and occupied thirteen days, one hundred and thirty witnesses were sworn and one hundred and fifteen exhibits were received in evidence. At this hearing, as in the previous hearing in cause No. 6581, a proposal to remove the ferry terminal from Port Blakely to Eagle Harbor was rejected by the department, but jurisdiction of the matter was retained in the order issued on May 16, 1936, for a period of one year, for the purpose of making such modifications or revisions of the order as the department, after investigation, might deem necessary and proper.

Another hearing was held in the matter during September and October, resulting in an order, from which we quote as follows:

"The problem with which the department is faced is a most difficult one. It does not seem probable that within the revenues of the respondent any ser-

vice to and from Bainbridge island can be ordered which will be reasonably adequate to meet the needs of its patrons, a great number of whom have made investments and built homes relying upon continued service.

"It was suggested by Captain Peabody, president of the company, that a further hearing be ordered and that the 'Company plan' and the 'Moran plan' discussed in our order of May 16, 1936, be further considered, as well as a plan of dividing trips to and from Seattle between Eagle Harbor and points on the Rolling Bay route. Attorneys for Rolling Bay, Moran, Manitou Beach, and tributary territory agree with this suggestion, except that they are unalterably opposed to any consideration of the 'Company plan' to centralize service to the island in Eagle Harbor."

The department opened the cause for further hearing in December, 1936. At this hearing, fifty-seven appearances were made by various interested parties, seventy-two witnesses testified, and a great number of exhibits were offered. That a strenuous effort was made to arrive at a proper general plan, appears from the record. Evidence was submitted on behalf of the Company plan, the Moran plan, the Fox plan, the Jones plan, the Spargur plan, the Yeomalt plan, the Split Ferry and Boat Service plan, the revised Company plan, and variations of all of them. At least ten attorneys participated in the hearing, and, when it was completed, the factual record, subsequently reviewed by the superior court of Thurston county and which is here for our review, had grown to 3,024 pages, supplemented by 165 exhibits, consisting of maps, schedules, and many complex financial statements.

When this is considered, together with the fact that, to a large extent, the same matters were gone into in the two hearings which resulted in the orders reviewed by the court in the cases heretofore cited,

it is manifest that a vast amount of earnest effort has been expended by the department of public service in an attempt to reach a just solution of the Bainbridge island transportation problem. In one of its orders, the department, while acknowledging the co-operative attitude of the residents of the island, pointed out that their interests are so necessarily diverse that no order could, or can, be made which would be satisfactory to all; and that this is true is amply shown by the record. Even if the statute (Rem. Rev. Stat., § 10449 [P. C. § 5627]) did not direct that, upon review, the findings of fact made by the administrative body shall be deemed *prima facie* correct, we would give them that standing in this instance, since they are the findings of experts, long familiar with the problem involved, who had personal knowledge of the physical conditions and had personal contact with the parties and witnesses during the long series of hearings.

The hearings were completed on December 15, 1936, and the matter was taken under advisement. Findings of fact, opinion, and order, comprising some thirty pages, were not issued until July 26, 1937. In substance, the order authorized the company to move the ferry terminal from Port Blakely to Eagle Harbor, to give additional steamer service between Eagle Harbor docks and Seattle between June first and October first and, if found necessary, during the rest of the year, and ordered the company to purchase the existing bus lines on the island and operate both the ferry and the bus lines as per detailed schedule set out in the findings. The order also temporarily fixed the fares and consolidated the proceedings with cause No. 7040, then pending before the department for the purpose of fixing permanent rates. The company was given thirty days to construct the neces-

sary docks at Eagle Harbor, provide the necessary busses, and to organize the service in accordance with the order, the then service to be continued without diminution until all preparations for the new service should be completed by the department.

From this order, the country club and its individual members took a writ of review to the superior court of Thurston county, and a similar writ was taken by the port of Yeomalt and some fifty persons resident in the north end of the island, particularly in the Rolling Bay district. The causes were consolidated in the superior court, and, upon a hearing thereon, the findings, opinion, and order of July 26, 1937, were in all respects affirmed. An appeal was taken to this court on behalf of all the parties. Briefs were filed, however, by the country club and its members only.

The particular grievance of the country club and its members, and it is a substantial one, is that their large investment was made upon the faith of the long-continued service, and that the value of their property and their enjoyment of it are greatly diminished by the requirements of the order.

They attack the order upon legal grounds, contending, first, that a public utility corporation cannot be permitted to abandon a portion of its service, except by surrendering its entire privilege or franchise. To this contention, we think, there are at least two sufficient answers. The state has asserted plenary authority over the kind of transportation involved in a number of statutes, and in none more completely than in the act requiring certificates of necessity (Chapter 248, Laws of 1927, p. 382), which was held constitutional in *Kitsap County Transportation Co. v. Manitou etc. Ass'n, supra.* This statute grants to the department the power to say what service is necessary, or whether any service is necessary. Furthermore,

the company was not authorized to abandon service, but merely to substitute service of a different kind. Although the facts are somewhat different, the principle applied in *State ex rel. Port Orchard v. Department of Public Service,* 186 Wash. 424, 58 P. (2d) 352, is applicable to the instant case.

It is further contended (1) that the department had no authority to cancel the service without first having considered the question of revenues and possible increase of rates; (2) that, in so far as the department considered rates, they did so upon a fundamentally wrong basis, in that they used as a basis original cost without proper deductions for depreciation; and (3) in determining what service the company was financially able to render, the department should have considered the company's operations as a whole.

A detailed discussion of these matters would unwarrantably extend an already too long opinion. We are convinced, from a study of the record, that the department was warranted, upon its own theory of rate calculation, or even upon the appellants' theory, in coming to the conclusion, and finding as a fact, that the revenues accruing were not sufficient to maintain the service formerly ordered in cause No. 6581 or the operation of more than one vehicular ferry. That was not only amply demonstrated by the proven experience of the company since the order was entered in that cause in August, 1933, but even by experience prior to that.

It was contended at the hearing that, even so, the department should take into consideration that, at that time (December, 1936), business was on the upgrade, and that revenues were bound to increase. The department rejected that contention, and it would now seem, wisely, for it is a matter of common knowledge

that these hopeful expectations received a set-back about the month of August, 1937.

As to the third point, we think it was particularly within the province of the regulatory body to determine that matter. The Kitsap company operated vessels to mainland points north and west of Bainbridge island and a ferry to Vashon. Whether the residents of these districts should be required to pay an unreasonable rate in order that the residents of Bainbridge island should have better service is, we think, at least within limits, a matter for the decision of the department. We do not find any direct evidence that the company was making large, or even adequate, returns on its other routes. As to this matter, the order recited, in part:

"The department believes that, generally speaking, all of the operations of a particular company or organization should be considered together, but that this principle should not be given full effect unless rates on each route are in themselves at least fair and reasonable."

We do not find this attitude capricious or arbitrary.

We come now to the most serious question raised on the appeal. The appellants contend that the findings, opinion, and order are, to a large extent, based upon (1) matters not shown by the evidence; and (2) occurrences which took place after the conclusion of the hearings. They call attention to the fact that our statutes provide for a complete transcript of all testimony (Rem. Rev. Stat., § 10423 [P. C. § 5608]), and that provision is made for review on this record alone, both by the superior court (§ 10428 [P. C. § 5613]), and by this court (§ 10430 [P. C. §5615]). The appellants also rely generally upon our decision in *State ex rel. Puget Sound Power & Light Co. v. Department of Public Works,* 181 Wash. 105, 42 P. (2d) 424, and such

cases as *Ohio Bell Telephone Co. v. Public Utilities Commission,* 301 U. S. 292, 81 L. Ed. 1093, 57 S. Ct. 724; *Northern Pac. R. Co. v. Department of Public Works,* 268 U. S. 39, 69 L. Ed. 836, 45 S. Ct. 412; *Interstate Commerce Commission v. Louisville & N. R. Co.,* 227 U. S. 88, 57 L. Ed. 431, 33 S. Ct. 185; *United States v. Abilene & S. R. Co.,* 265 U. S. 274, 68 L. Ed. 1016, 44 S. Ct. 565, and many other cases from both Federal and state courts. The point involved is, perhaps, as concisely stated in the case of *Atchison, Topeka & Santa Fe R. Co. v. Commerce Commission,* 335 Ill. 624, 167 N. E. 831, as in any other:

"The commissioners cannot act on their own information. Their findings must be based on evidence presented in the case, with an opportunity to all parties to know of the evidence to be submitted or considered, to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal, and nothing can be treated as evidence which is not introduced as such."

It is said in the cases cited that the regulatory body must base its findings on evidence before it, and that nothing can be treated as evidence which has not been introduced as such, and in one of the cases, that a violation of these principles constitutes "a denial of due process," and in another, is "inconsistent with rational justice." While these principles are well established, they must not be applied too literally. A regulatory body may, undoubtedly, properly take into consideration the results of its own inspection of the physical conditions involved, results of its previous experience in similar situations, and the general information concerning the subject, which goes to make up its fund of expert knowledge. We have often so held. *State ex rel. Northern Pac. R. Co. v. Public Service Commission,* 95 Wash. 376, 163 Pac. 1143, 166 Pac. 793; *State ex*

*rel. Seattle v. Public Service Commission,* 107 Wash. 17, 180 Pac. 913; *State ex rel. American Telechronometer Co. v. Baker,* 164 Wash. 483, 2 P. (2d) 1099; *State ex rel. Consolidated Freight Lines v. Murray,* 182 Wash. 98, 44 P. (2d) 1031.

The findings, opinion, and order under review constitute a lengthy document and contain a great deal of language which invites the contention made by the appellants. It is recited that an order was practically ready for issuance when a ferry strike occurred, commencing the last day of May, 1937, and the order continues on page 3:

"The strike continued until June 26th, when the men returned to work and the boats started to operate again upon the basis of an agreement secured through the mediation of the governor of Washington and the department of public service, which insured to the employees higher wages and shorter working hours and other improvements in working conditions. Of course these strike settlement provisions entailed a substantial increase in the operating expenses of respondent's operations in the Bainbridge island service."

The appellants also call attention to the following language:

"Since the close of the (December) hearing the respondent's steamers HYAK and WINSLOW have been ordered out of service by the United States Steamboat Inspection Service. Also since that hearing we have had the ferry strike and are now faced with substantial increases in operating expenses due to the increased wages, shorter hours and other working condition improvements granted to the employees. Accordingly, the situation before us is substantially different from what it was at the conclusion of the December hearing. At the present time, however, we will first consider the conditions existing before the steamers HYAK and WINSLOW were eliminated from service and before the operating expense increases

resulting from the strike settlement were encountered."

From these expressions, and some others less direct but of similar tenor, it is argued with much plausibility that the findings show, on their face, that the order was issued as a result of occurrences after the close of the hearing, and of information acquired after its close, which is not even specified and concerning which, in any event, the appellants never had any opportunity to be heard.

From an examination of the whole of the findings, opinion, and order, we do not find that this is a necessary conclusion. We think the order is based upon the evidence taken at the hearings, although the recitals upon which it is based, unfortunately, go out of their way to cite later occurrences in an attempt to show that the conclusion arrived at was correct. We quote the introduction to the actual findings immediately preceding the order. The italics are supplied.

"We see no alternative but to resort to a form of the company's revised plan and centralize all ferry and boat service in Eagle Harbor and provide busses connecting with all other points on the island. *The profits which could be reasonably expected under the basis of expenses prior to the recent strike would not justify more service.* With the additional labor expense resulting from the settlement of the strike, *our* conclusion is forced upon us all the more strongly. *The following statement sets forth the revenues and expenses and return which could be reasonably expected on the basis of pre-strike traffic and pre-strike rates and pre-strike labor conditions, if the service which we find necessary is given.*"

It will be noted that the order is based upon a consideration of the expenses *"prior"* to the strike, and that the estimate of revenues is based upon "pre-strike traffic and pre-strike rates and pre-strike labor condi-

tions." We are furthermore of the opinion, and this, after all, is the important point, that the evidence taken at the hearings, and we, at least, have considered no other, is sufficient to support the findings and order.

Finally, we are of the affirmative opinion, based upon a consideration of the whole record, that the department arrived at as good a solution of the problem as could have been made. But, if we are mistaken as to that, we call attention to the fact that the order has been in force now nearly eighteen months, and, if it has, in practice, resulted in the denial of legal rights or has caused any of the dire effects which those who opposed its entry feared it would cause, this must now be capable of proof. The departmental order is not *res adjudicata* as to the amount and kind of service to be furnished to the residents of the island, and relief, if it be necessary and required, may be obtained as readily in a new proceeding as by opening up the instant case; indeed, more readily, for this record has become so voluminous and unwieldy that its further amplification would render an intensive review thereof a vexatious and well-nigh impossible task.

The judgment appealed from is affirmed.

BLAKE, C. J., BEALS, MILLARD, and STEINERT, JJ., concur.