**FILED**
**APRIL 3, 2018**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JAMES COURTNEY and CLIFFORD COURTNEY, | ) ) ) | No. 35095-9-III |
| Appellants, | ) ) | |
| v. | ) ) | |
| WASHINGTON UTILITIES AND TRANSPORTATION COMMISSION; DAVID DANNER, chairman and commissioner, ANN RENDAHL, commissioner, and JAY BALASBAS, commissioner, in their official capacities as officers and members of the Washington Utilities and Transportation Commission; and STEVEN KING, in his official capacity as executive director of the Washington Utilities and Transportation Commission, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | PUBLISHED OPINION |
| Respondents, | ) ) | |
| ARROW LAUNCH SERVICE, INC., | ) ) | |
| Intervenor. | ) | |

LAWRENCE-BERREY, C.J. — RCW 81.84.010(1) prohibits operating a commercial

ferry for the public use over a regular route unless the Washington Utilities and

Transportation Commission (WUTC) issues a certificate declaring that public

convenience and necessity (PCN) requires such operation. James Courtney and Clifford

Courtney sought a declaratory order from the WUTC to determine whether any of their

five proposed commercial ferry services on Lake Chelan would require a PCN certificate.

They contended that none of their proposed services were "for the public use," as

contemplated by RCW 81.84.010(1). The WUTC disagreed and concluded that all five of

the Courtneys' proposed ferry services were for the public use and would require a PCN

certificate.

On appeal, the Courtneys contend that the WUTC erred in too broadly construing

"for the public use." They also contend that the WUTC acted arbitrarily or capriciously

because it treats surface transportation carriers differently from commercial ferries and

because the WUTC refused to apply the charter service exemption for commercial ferries

to one of its proposed ferry services.

We review the legislative intent behind RCW 81.84.010(1), conclude that the

phrase "for the public use" should be construed broadly to protect regulated commercial

ferries, and affirm the WUTC.

## FACTS

Lake Chelan Boat Company has operated a year-round commercial ferry service

on Lake Chelan since 1918. The WUTC's predecessor issued a PCN certificate to Lake

Chelan Boat Company in 1929 and, since that time, Lake Chelan Boat Company has successfully protected its exclusivity.

The Courtneys are residents of Stehekin, Washington, a small, unincorporated town at the northwest end of Lake Chelan. The Courtneys and their families own several businesses in Stehekin, Washington, including two floating plane companies, Stehekin Valley Ranch, Stehekin Outfitters, Stehekin Log Cabins, and Stehekin Pastry Company. They have attempted to operate their own commercial ferry on Lake Chelan for the past two decades. Stehekin, a popular tourist destination, is accessible only by boat, plane, or foot.

In 2009, Cliff Courtney sent a letter to his state legislators and the governor urging them to eliminate or relax the commercial ferry PCN requirement. The legislature passed, and the governor signed, a bill directing the WUTC to study and report on the appropriateness of the regulations governing ferry service on Lake Chelan.

The WUTC published its report in early 2010. The report reviewed the history of ferry service regulation on Lake Chelan from 1911 to 2009 and the legal framework for regulation and its rationale. The report discussed the then-current ferry service on Lake Chelan and the views of stakeholders as to whether existing laws should be relaxed to

allow unregulated commercial ferries to compete with regulated commercial ferries. The

report concludes with a discussion and recommendation to the legislature:

> [T]he ferry services provided by the Lake Chelan Boat Company provide a lifeline to the communities of Stehekin and Holden Village. Faced with the question posed in 1921—would these communities be adequately served by unregulated passenger ferry operators?—the present Commission could not say with confidence that they would.
>
> In the short term, it is conceivable, and perhaps likely, that during the busy summer months customer would enjoy the benefits of competition among boat operators, who would lower fares and improve service to make their offerings more attractive to potential customers. During these periods, tourism may even increase as prices fall.
>
> But we agree with our predecessors that . . . ferry operators would cease all unprofitable activities. With no legal obligation to serve, they would reduce or eliminate services during the winter months, or during times when fuel prices are high, or during times when more attractive business opportunities arise for the use of their boats or docking facilities. Even if revenues during the summer months would allow the operators revenue to serve year-round, they would not be expected to so if such activities were unprofitable and they were under no obligation to provide them. In any event, it is not clear that summer operations would subsidize winter service if the operators were to lose market share during those months to seasonal competitors.
>
> Moreover, the issue of safety must be considered. Because the purchase, maintenance and operation of ferry service is a costly venture . . . we doubt that the opportunity to provide ferry service on Lake Chelan will attract more than a few operators that the Commission would deem "fit, willing and able" to provide service under current standards. . . .
>
> For these reasons, the Commission does not recommend at this time any changes to the state laws dealing with commercial ferry regulation as it pertains to Lake Chelan. . . .

Clerk's Papers (CP) at 287.

In 2011, the Courtneys commenced a federal constitutional challenge to the PCN requirement. The federal district court dismissed the Courtneys' claims, but the Ninth Circuit reversed in part. On remand, the federal district court issued an order "retain[ing] jurisdiction over [the Courtneys'] second constitutional claim pending an authoritative construction of the phrase 'for the public use for hire' by the WUTC or the Washington state courts." CP at 252.

In furtherance of that order, the Courtneys filed a petition with the WUTC for it to determine the meaning of "for the public use for hire."[1] The WUTC declined to enter an order on the basis that the petition lacked sufficient information and operational details. The Courtneys then filed a second petition setting forth five proposed ferry services so that the WUTC could make its determination as to each proposed service.

The services share several features in common. The proposed vessel is a 50- to 64-foot climate-controlled boat, and would operate between Memorial Day and early October of each year. Each service would charge a flat rate of $37 per adult passenger for a one-way ticket, or $74 for a round trip.

---

[1] The WUTC has defined "for hire" as "transportation offered to the general public for compensation." WAC 480-51-020(7). The Courtneys do not challenge the WUTC's definition of this part of the statutory language. For this reason, we truncate the phrase

Each service would be a scheduled run between Stehekin and the federally-owned dock in either Fields Point Landing or Manson Bay Marina. The boat would leave Stehekin at 10:00 a.m., arrive at either destination at noon, depart at 12:30 p.m., and arrive back at Stehekin at 2:30 p.m. The primary difference among the proposed services are the scope of passengers the boat would carry:

> Proposal 1 (Lodging Customers of Stehekin Valley Ranch)—Passengers would be limited to persons with confirmed reservations to stay overnight at Stehekin Valley Ranch, owned by Clifford Courtney and his wife. The boat transportation service would be owned by Clifford Courtney, and make no intermediate stops.

> Proposal 2 (Lodging Customers and Customers of Other Activities Offered at Stehekin Valley Ranch)—In addition to persons with reservations to stay at the ranch, passengers would include anyone with reservations to participate in any of the activities the ranch offers, including activities provided by Stehekin Outfitters, run in part by Clifford Courtney's son. Again, the boat transportation service would be owned by Clifford Courtney and would make no intermediate stops.

> Proposal 3 (Customers of Courtney Family-owned Businesses)—Passengers would be limited to anyone with reservations at any business owned by Clifford or James Courtney or their extended family, including but not limited to the Stehekin Valley Ranch. The boat would make intermediate stops at, or stand-alone trips to, other points on Lake Chelan as necessary to access the businesses. The boat transportation service would be owned by James and Clifford Courtney.

> Proposal 4 (Customers of Stehekin-Based Businesses)—Passengers could be anyone with reservations at any Stehekin-based businesses that want to

from here forth.

use the service, including but not limited to Courtney family-owned businesses. The boat would make intermediate stops at, or stand-alone trips to, other points on Lake Chelan as necessary to access the businesses. The boat transportation service would be owned by James and Clifford Courtney.

Proposal 5 (Charter by Stehekin-based Travel Company)—Passengers would be restricted to persons who have purchased a travel package from a Stehekin-based travel agency that is not affiliated with the Courtneys but would charter the boat from the Courtneys. The boat would make intermediate stops at, or stand-alone trips to, other points on Lake Chelan as necessary to access the travel locations. The boat transportation service would be owned by James and Clifford Courtney.

CP at 429-30. In all of the proposed services, the commercial ferry service would be owned independently from the other businesses.

The WUTC issued notice for all interested persons or entities to submit comments. Lake Chelan Boat Company expressed its opposition to another ferry service on Lake Chelan, claiming its financial viability and ability to operate year-round services for the public would be under threat. Arrow Launch Service, Inc.—a PCN ferry operator not servicing Lake Chelan—also expressed its opinion that the Courtneys' proposed services would create a template for setting up ferries that are public in all but name, which would threaten the viability of all true regulated public ferries in Washington.

The WUTC heard oral argument and issued its declaratory order a few weeks later. The WUTC noted that the only legal issue was whether the proposed services would

7

operate "for the public use" within the meaning of RCW 81.84.010(1). The order noted

that the legislature did not define the phrase and that neither the WUTC nor any

Washington court had interpreted the phrase.

The WUTC then looked to the plain language of the statute to derive the

legislature's intent. Relying on a dictionary definition, the WUTC construed "for the

public use" as meaning "'accessible to or shared by all members of the community.'"

CP at 432-33. Relying on a dictionary definition once again, the WUTC construed

"community" as meaning "'a body of individuals organized into a unit'" or "'linked by

common interests.'" CP at 433. Combining the dictionary definitions for both terms, the

WUTC concluded that a commercial ferry operator must obtain a PCN certificate when

the ferry "is accessible to all persons that are part of a group with common interests."

CP at 433.

The Courtneys argued to the WUTC that their proposed services were not for the

public use because ferry services would be limited to customers of one or more particular

Stehekin businesses. The WUTC noted that the United States Supreme Court had

rejected a similar argument in *Terminal Taxicab Co. v. Kutz*, 241 U.S. 252, 36 S. Ct. 583,

60 L. Ed. 984 (1916). The WUTC, in rejecting this argument, concluded that limiting

services to persons who are demonstrated customers of specific businesses would not remove the services' essential public character.

The Courtneys also argued that exemptions applicable to commercial ferries should be as broad as exemptions applicable to surface transportation companies. The WUTC, noting that there are important differences between the commercial ferry statutes and surface transportation statutes, rejected that argument.

The Courtneys further argued that Proposal 5 was exempt under the ferry charter service exemption. The WUTC disagreed and explained that Proposal 5 was not a true charter service because it would not transport cohesive groups for a single agreed-upon purpose; rather, it would simply be customers of Stehekin businesses aggregated through a third-party booking agency, thus maintaining the public character of the previous proposals.

The WUTC issued a declaratory order that stated the Courtneys must first obtain a PCN certificate before operating any of their five proposed ferry services. The Courtneys sought judicial review of the declaratory order in Chelan County Superior Court. That court affirmed the agency's decision.

The Courtneys appealed to this court.

No. 35095-9-III
*Courtney v. Wash. Utils. & Transp. Comm'n*


ANALYSIS

A.      REVIEW OF AN AGENCY ORDER IN GENERAL

Our limited review of an agency order is governed by the Administrative

Procedure Act (APA), chapter 34.05 RCW. *Campbell v. Emp't Sec. Dep't*, 180 Wn.2d

566, 571, 326 P.3d 713 (2014). We sit in the same position as the superior court and

apply the APA standards directly to the administrative record. *Id.* Thus, the decision we

review is that of the agency, not of the superior court. *Id.*

RCW 34.05.570(3) sets forth nine bases by which a court may grant relief from an

agency order in an adjudicative proceeding. The Courtneys seek review on two bases.

The Courtneys claim that the WUTC's order (1) erroneously interpreted or applied the

law[2] and (2) is arbitrary or capricious. *See* RCW 34.05.570(3)(d), (i). For both claims,

the Courtneys have the burden of proof. RCW 34.05.570(1)(a).

B.      THE WUTC DID NOT ERR IN DEFINING "FOR THE PUBLIC USE"

          1.    <u>"For the public use" is ambiguous; it can mean the general public or a subset of the public</u>

---

[2] The Courtneys requested relief under a narrower basis, RCW 34.05.570(4)(c)(ii), i.e., agency action outside its statutory authority. The commission obviously had authority to enter its declaratory order. *See* RCW 34.05.240. The Courtneys' actual argument is broader: the Courtneys challenge the WUTC's interpretation of "for the public use." The WUTC acknowledges this in its brief. WUTC Br. at 12 n.4. We therefore review the Courtneys' broader argument.

10

RCW 81.84.010(1) provides in relevant part:

> A commercial ferry may not operate any vessel or ferry *for the public use* for hire between fixed termini or over a regular route upon the waters within this state . . . without first applying for and obtaining from the commission a certificate declaring that public convenience and necessity require such operation.

(Emphasis added.)

The WUTC interpreted "for the public use" as meaning "accessible to all persons *that are part of a group with common interests*." CP at 433 (emphasis added). This interpretation allows "for the public use" to apply to a subset of the public. For example, it would apply to a subset of the public who wish to patronize one business in Stehekin or a group of businesses in Stehekin.

The Courtneys argue that the WUTC's construction is too broad and should not include subsets of the public. They argue that their proposed ferry services are not "for the public use" because their ferry services would not be accessible to the general public but instead would be limited to those who wish to patronize one Stehekin business or a group of Stehekin businesses.

We must determine whether the legislature intended "for the public use" to apply to a subset of the public.

To begin our analysis, we first recite general rules of statutory interpretation:

11

When interpreting a statute, the court's fundamental objective is to ascertain and give effect to the legislature's intent. We begin with the plain meaning of the statute. In doing so, we consider the text of the provision in question, the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole. If the meaning of the statute is plain on its face, then we must give effect to that meaning as an expression of legislative intent. If, after this inquiry, the statute remains ambiguous or unclear, it is appropriate to resort to aids of construction and legislative history.

*Lenander v. Dep't of Ret. Sys.*, 186 Wn.2d 393, 405, 377 P.3d 199 (2016) (citations

omitted).

We note that the phrase, "for the public use," is not defined. So, we review the

statutory scheme to discern legislative intent. Our review is assisted by the WUTC's

2010 report to the legislature that accurately summarizes the scheme:

*Rate and service regulations*—Once granted a certificate for the provision of commercial ferry service, the operator's rates and services are subject to regulation by the Commission. [Chapter 81.28 RCW; chapter 81.04 RCW] This means that the operator must file with the Commission a tariff reflecting its fares and terms of service and must charge only in accordance with that tariff. [RCW 81.28.040, .080] If the operator wishes to change its rates or terms, it must file an amendment to its tariff on 30 days notice to the Commission and the public. [RCW 81.28.050] The Commission may audit the company's books and records and if the Commission is not satisfied that the rates reflected in the tariff are fair, just, reasonable and sufficient, the Commission may suspend the operation of the tariff amendments and initiate an adjudication to determine the rates and terms of service. [RCW 81.04.130]

> The Commission may revoke an operator's certificate if the operator fails to provide the service described in its tariff or if it fails to comply with the statutes and rules governing commercial ferry service. [RCW 81.84.060]
>
> *Protection against competition*—Certificated commercial ferries enjoy considerable protection from competition as long as they continue to provide satisfactory service and comply with regulations. If a person applies for a certificate to initiate a new ferry service on a route or in an area already served by an incumbent certificate holder, the incumbent must be afforded notice and an opportunity to be heard. [RCW 81.84.020] More importantly, the Commission may not grant a certificate to operate in an area already served by an existing certificate holder, unless the existing certificate holder has failed or refused to furnish reasonable and adequate service, or the existing certificate holder does not object. [RCW 81.84.020]

CP at 266-67 (footnotes omitted).

The statutory scheme does not answer whether the legislature intended "for the public use" to apply to a subset of the public. We next look to the historical construction of the statutory scheme.

> 2. A significant case interpreting the rights of PCN ferry operators reinforces the WUTC's determination that "for the public use" extends to a subset of the public

In *Kitsap County Transportation Co. v. Manitou Beach-Agate Pass Ferry Ass'n*, 176 Wash. 486, 494-96, 30 P.2d 233 (1934), the Supreme Court described the strong public policy that supports protecting a regulated ferry from unregulated competition. There, Kitsap County Transportation Company (KCTC) held a certificate to provide year-around ferry service from Seattle to a point on Bainbridge Island. *Id.* at 487. A group of

13

Bainbridge residents, dissatisfied with the service, formed an association for the purpose of having alternate ferry service. *Id.* at 488. The association entered into a charter agreement with Puget Sound Navigation Company to use one of its ferries for $7,500 per month. *Id.* at 494. The chartered ferry was available only to a subset of the public—club members, their families, their servants, or their guests. *Id.* at 492. To be a club member, a person was required to pay $1 per year. *Id.* at 494.

KCTC obtained an injunction and stopped the competing ferry service. *Id*. at 488-89. After a trial, the lower court entered a permanent injunction. *Id*. at 489. The Supreme Court affirmed. *Id*. at 496. In affirming, the court explained the public policy that supported issuance of a PCN certificate to one operator and the threat to public welfare by permitting unregulated competition. *Id.* at 489-96. The court concluded: "To allow a competitor to enter the field would be to encourage ruinous competition which would be not only destructive of [KCTC]'s rights under its certificate of convenience and necessity, but inimical to the best interests of the traveling public at large." *Id.* at 496.

      3.    <u>RCW 81.84.020(1) confers on the WUTC the power to grant exclusive rights to an operator in compliance with its public obligations</u>

The Courtneys nevertheless assert that some unregulated competition must be permitted. Citing *In re Electric Lightwave, Inc.*, 123 Wn.2d 530, 869 P.2d 1045 (1994),

14

they argue that Washington Constitution article XII, section 22 manifests the state's

abhorrence of monopolies and, where a statute is ambiguous, our state constitution makes

it inappropriate to impute a conferral of authority on the WUTC to grant monopolies.

*Electric Lightwave* is distinguishable on the basis that the legislature granted the

WUTC different authority to regulate competition between the two statutory schemes.  In

*Electric Lightwave*, the court reviewed the legislature's grant of authority to the WUTC to

regulate telecommunications companies.  RCW 80.36.230 provides, "The commission is

hereby granted the power to prescribe exchange area boundaries and/or territorial

boundaries for telecommunications companies."  The court held:

> This language does not confer on the [WUTC] the power to grant
> monopolies or exclusive rights.  Since the [WUTC] is fully capable of
> exercising its authority under RCW 80.36.230 without the power to grant
> monopolies or other exclusive rights, the text does not necessarily or
> impliedly grant such power.

*Electric Lightwave*, 123 Wn.2d at 537.

We contrast the WUTC's authority to protect a singular telecommunications

company with its authority to protect a singular commercial ferry operator.  With the

former, the legislature did not explicitly or implicitly grant the WUTC authority to protect

one telecommunications company over another.  With the latter, the legislature explicitly

15

directs the WUTC to protect a PCN ferry operator from an applicant seeking to provide

competing services for the public use. RCW 81.84.020(1) provides, in relevant part:

> [T]he commission may not grant a [PCN] certificate to operate between
> districts or into any territory . . . already served by an existing certificate
> holder, unless the existing certificate holder has failed or refused to furnish
> reasonable and adequate service, has failed to provide the service described
> in its certificate or tariffs . . . or has not objected to the issuance of the
> certificate as prayed for.

As noted in our discussion of *Kitsap County Transportation Co.*, this authority

extends to protecting a PCN ferry operator from an unregulated commercial ferry seeking

to provide competing services for the public use.[3]

### 4. Old decisions from states outside Washington do not persuasively establish legislative intent

The Courtneys also assert that various decisions, mostly over 100 years old and

from other jurisdictions, warrant a narrower construction of "for the public use." The

WUTC asserts that most of the decisions are distinguishable on one or more bases. We

need not analyze these other decisions given our view that *Kitsap County Transportation

Co.* justifies a broad construction of "for the public use" to protect a PCN ferry operator

from unregulated competition.

---

[3] Further, the protections afforded by RCW 81.84.020(1) do not run afoul of
Washington Constitution article XII, section 22's prohibitions on monopolies. This is
because the grant of a right to operate ferries across navigable waters is not the grant of a

### 5. The WUTC's definition is appropriate

We next determine whether we should adopt the WUTC's definition. While the courts retain ultimate authority to interpret a statute, we afford great weight to an administering agency's interpretation of a statute's legislative intent. *Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n*, 123 Wn.2d 621, 628, 869 P.2d 1034 (1994).

As mentioned previously, the WUTC utilized dictionary definitions to interpret "for the public use" in a manner that extends the phrase to subsets of the public. This extension is consistent with *Terminal Taxicab Co. v. Kutz*, 241 U.S. 252. *Terminal Taxicab* was the leading case discussing the phrase "public use" when our legislature, in 1927, enacted what now is RCW 81.84.010.

In *Terminal Taxicab*, a taxi company with exclusive rights to serve certain District of Columbia hotels unsuccessfully argued that its operations fell outside the District's authority to regulate. *Id*. at 257. The District's authority extended to "'controlling or managing any agency or agencies for public use for the conveyance of persons or property within the District of Columbia for hire.'" *Id*. at 253 (quoting Public Utilities Commission Appropriation Act of Mar. 4, 1913, ch. 150, § 8, ¶ 1). Similar to the limitations in the Courtneys' five proposals, the taxi company limited its services to a

private or common right. *Kitsap County Transp. Co.*, 176 Wash. at 489-91.

subset of the public, i.e., only persons who were guests of hotels with whom it had a

contract. *Id*. at 254-55. The United States Supreme Court held that such a limitation did

not strip the taxi company of its public character:

> No carrier serves all the public. His customers are limited by place,
> requirements, ability to pay, and other facts. But the public generally is free
> to go to hotels if it can afford to, as it is free to travel by rail, and through
> the hotel door to call on the plaintiff for a taxicab. . . . The service affects
> so considerable a fraction of the public that it is public in the same sense in
> which any other may be called so. *The public does not mean everybody all
> the time.*

*Id*. at 255 (citations omitted) (emphasis added).

Similarly here, the public is free to visit Stehekin. Limiting service to guests of

one or more Stehekin businesses does not strip the proposed ferry service of its public

character. Subject to consideration of the Courtneys' next argument, we believe that the

WUTC's rule is correct and consistent with the legislative intent of RCW 81.84.010(1).

The Courtneys argue that *Terminal Taxicab* is distinguishable because their

proposed services would not affect a considerable portion of the public. At first blush,

their argument is persuasive. How could Proposal 1 or Proposal 2 impact the viability of

the current PCN certificate holder and thus the public?

In the context of commercial ferries, an operator must make a sizeable capital

investment to purchase a ferry. Also, the daily variable costs of ferry service requires a

large stream of revenue sufficient to cover both daily expenses and to provide a

reasonable rate of return on the initial capital investment.

The Courtneys' proposed vessel is a 50- to 64-foot, climate-controlled boat that

would provide service between Memorial Day and early October of each year. At $37 per

adult ticket, the service would be viable only if the four-month demand is substantial. We

therefore conclude that any viable proposal would sufficiently impact the current PCN

certificate holder and thus the public.

C. THE WUTC'S ORDER IS NOT ARBITRARY OR[4] CAPRICIOUS

The Courtneys make two arguments to support their contention that the WUTC's

order is arbitrary or capricious. We will discuss each argument in turn.

The scope of review under an arbitrary or capricious standard is very narrow, and

the party asserting it carries a heavy burden. *Ass'n of Wash. Spirits & Wine Distribs. v.

Wash. State Liquor Control Bd.*, 182 Wn.2d 342, 359, 340 P.3d 849 (2015). An agency's

decision is arbitrary or capricious if the decision is the result of willful and unreasoning

disregard of the facts and circumstances. *Overlake Hosp. Ass'n v. Dep't of Health*, 170

Wn.2d 43, 50, 239 P.3d 1095 (2010). "'[W]here there is room for two opinions, an

---

[4] RCW 34.05.570(3)(i) permits a court to grant relief if the agency decision is "arbitrary *or* capricious." Appellate decisions, perhaps using a prior standard, often speak of "arbitrary *and* capricious." We will use the statutory standard in our analysis. We do

action taken after due consideration is not arbitrary [or] capricious even though a reviewing court may believe it to be erroneous.'" *Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n*, 148 Wn.2d 887, 904, 64 P.3d 606 (2003) (first alteration in original) (quoting *Rios v. Dep't of Labor & Indus.*, 145 Wn.2d 483, 501, 39 P.3d 961 (2002)).

### 1. Surface transportation is not similar to commercial ferries

The Courtneys argue that the WUTC's order is arbitrary or capricious because the WUTC exempts certain surface transportation activities but does not exempt comparable commercial ferry activities. "Agencies should strive not to treat similar situations differently and should strive for equal treatment." *Stericycle of Wash., Inc. v. Wash. Utils. & Transp. Comm'n*, 190 Wn. App. 74, 93, 359 P.3d 894 (2015).

The Courtneys note that surface (or passenger) transportation companies, similar to commercial ferry operators, must obtain a PCN certificate. WAC 480-30-086(1). The Courtneys contend that WAC 480-30-011(6),[5] (8),[6] and (9)[7] provide exemptions from the

---

not believe the different standards result in a different analysis or result.

[5] "Person owning, operating, controlling, or managing . . . hotel buses . . . ."

[6] "Private carriers who, in their own vehicles, transport passengers as an incidental adjunct to some other established private business owned or operated by them in good faith."

[7] "Transporting transient air flight crew or in-transit airline passengers between an airport and temporary hotel accommodations under an arrangement between the airline carrier and the passenger transportation company."

PCN certificate requirement to surface transportation companies that are analogous to one or more of their five proposed ferry services.

First, we fail to see the similarity between the noted surface transportation exemptions and any of the Courtneys' proposed commercial ferry services.

Second, the statutory treatment of surface transportation companies is different from the statutory treatment of commercial ferries. The different treatment no doubt is due to the differences between the two types of commercial carriers. For instance, taxis and buses are ubiquitous, and ferries are not. If a taxi service in a city suddenly ceases operation, residents will have numerous alternatives to travel. But if the Lake Chelan Boat Company suddenly ceases operation, Stehekin residents would be hard-pressed to leave and return to Stehekin. This leads to the conclusion that surface transportation companies and commercial ferry operators are sufficiently different that the WUTC is not treating similar commercial carriers differently.

Third, the WUTC did consider the facts and circumstances when declining to apply the surface transportation exemptions to commercial ferry operators. The WUTC noted that hotel buses are expressly exempt by statute, that airline crew transportation between airports and hotels is simply a variation of hotel buses, and that private carriers that transport people incidental to an established business do not fit within the definition

of an "auto transportation company." This is because under RCW 81.68.010(3), transporting passengers incidental to an established business is not a transport business.

The Courtneys argue that the WUTC "could have" exempted their proposed services. However, in making this argument, they ignore the highly deferential standard of our review. In summary, we conclude that the WUTC did not act arbitrarily or capriciously by refusing to apply surface transportation exemptions to commercial ferry operators.

### 2. The WUTC did not err by refusing to treat Proposal 5 as a private charter service

The Courtneys next argue that the WUTC arbitrarily or capriciously ignored its own regulation and did not treat Proposal 5 as an exempt charter service.

WAC 480-51-020(14) exempts "charter service" from the PCN certificate requirements of RCW 81.84.010(1). The WUTC adopted this exemption pursuant to a 1995 legislative act—Laws of 1995, chapter 361, section 3, which authorized the exemption. The authorization expired in 2001. LAWS OF 1995, ch. 361, § 4. The WUTC neglected to remove the expired exemption from its rules.

The WUTC, recognizing the lack of a statutory basis for the exemption, nevertheless analyzed whether Proposal 5 would be a private charter service. The WUTC concluded that it would not. We agree.

22

A true charter does not operate within the meaning of RCW 81.84.010(1) because it represents a one-time private use between a chartering party and an operator. *See Cushing v. White*, 101 Wash. 172, 181-82, 172 P. 229 (1918). This arrangement can be contrasted with the arrangement previously discussed in *Kitsap County Transportation Co.* There, several Bainbridge Island residents formed an association to "charter" a competing ferry between Seattle and Bainbridge Island. *Kitsap County Transp. Co.*, 176 Wash. at 488. The association claimed that the competing ferry was merely a "club boat" operated for the convenience of "club members." *Id.* at 492. The court saw through the association's subterfuge and concluded that the association's real purpose "was to establish and maintain a vehicular ferry service between Seattle and [Bainbridge Island]." *Id.* at 488. The court concluded that the ferry service was a public use and affirmed the trial court's injunction. *Id.* at 496.

Similarly, Proposal 5 seeks to use a chartering arrangement to establish and maintain a ferry service between Stehekin and various other points on Lake Chelan. Proposal 5 is not a true charter because it does not involve a one-time private use between a chartering party and an operator. We conclude that Proposal 5 is a public use within the meaning of RCW 81.84.010(1).

23

No. 35095-9-III
*Courtney v. Wash. Utils. & Transp. Comm'n*

Affirmed.

_____
Lawrence-Berrey, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Siddoway, J.