[No. 59999-8. En Banc. March 17, 1994.]

*In the Matter of the Consolidated Cases Concerning the Registration of Electric Lightwave, Inc. and Registration and Classification of Digital Direct of Seattle, Inc.*

ELECTRIC LIGHTWAVE, INC., ET AL, *Respondents*, WASHINGTON INDEPENDENT TELEPHONE ASSOCIATION, ET AL, *Appellants*, v. THE UTILITIES AND TRANSPORTATION COMMISSION, *Appellant*.

532

*Vandeberg & Johnson,* by *Richard A. Finnigan,* for appellant Washington Independent Telephone Association.

*Richard E. Potter* and *Timothy J. O'Connell,* for appellant GTE Northwest, Inc.

*Christine O. Gregoire, Attorney General,* and *Donald T. Trotter, Assistant,* for appellant State.

*Robert S. Snyder,* for appellant Whidbey Telephone Company.

*Ater Wynne Hewitt Dodson & Skerritt,* by *Arthur A. Butler* and *Stephen J. Kennedy,* for respondents Electric Lightwave, Inc., and TRACER.

*Davis Wright Tremaine,* by *Daniel M. Waggoner* and *Gregory J. Kopta,* for respondent Digital Direct.

*Miller, Nash, Wiener, Hager & Carlsen, Clyde H. MacIver, Brooks E. Harlow,* and *Beth M. Andrus (William C. Harrel-*

*son* and *Sue E. Weiske*, of counsel), for respondent MCI Telecommunications Corporation.

UTTER, J. — Appellants seek to overturn a superior court order reversing in part and affirming in part three orders issued by the Washington Utilities and Transportation Commission (Commission or WUTC). We affirm the trial court's decisions that the Commission is powerless to grant exclusive rights to telecommunications companies, that the Commission properly registered Electric Lightwave, Inc. (ELI) and Digital Direct of Seattle, Inc. (DDS) as telecommunications companies, and that the Commission properly granted Digital Direct of Seattle, Inc.'s bid for competitive status. We also affirm the trial court's decision to award transcript fees to the Commission.

The issues before us are: (1) Does the Commission have the authority to grant exclusive or quasi-exclusive areas of service to local telephone companies? (2) Did the Commission properly register ELI and DDS as telecommunications companies? (3) Did the Commission properly deem DDS a "competitive" company? and (4) Were transcript fees properly awarded to the Commission?

## BACKGROUND

Telephone companies have been operating in Washington since the turn of the century. Historically, these companies have fallen into two significant groups. Local telephone companies, also known as local exchange companies (LEC's), have provided a range of telecommunications services within each exchange, including "access service" to local customers (end users). Interexchange telephone companies (IXC's) specialize in providing connections between exchanges. Thus, LEC's and IXC's have worked together to connect a call from one exchange to another. In return for its use of an LEC's access services, an IXC compensates the LEC with access-service tariffs. Since IXC's have historically had little choice but to use the access services of LEC's to connect to end users, MCI Telecommunications Corpora-

tion (MCI) — an interexchange telephone company — has described itself as a "captive customer". See Brief of Respondent (MCI), at 8.

The Legislature created the Department of Public Service[1] as a state agency empowered under RCW Title 80 to regulate the rates, services, facilities, and practices of various companies in which the public has an interest. Pursuant to this statute, the Commission has regulated telecommunications companies. The Commission's responsibilities include review of applications for registration of telephone companies. RCW 80.01.040(3).

On September 18, 1990, and July 3, 1991, respectively, ELI and DDS applied to the Commission for approval of their bids to become telecommunications companies. They proposed a host of telecommunications services, including access services which theretofore had been provided mainly by LEC's. ELI proposed service in Seattle and "other geographical areas that may seem feasible". Administrative Record (ELI exhibits — application for registration), at 1160. DDS proposed service for the east Puget Sound metropolitan area. Administrative Record (DDS's application with attachments exhibit A), at 140. DDS noted the possibility of providing "dark fiber"[2] services, Administrative Record (DDS's Application with attachments exhibit A), at 140, and indicated its intention of leasing fiber from TCI Cablevision (TCI), a corporate parent and cable company, to provide any such services. Transcript of Proceedings (DDS) (Dec. 9, 1991) vol. 2, at 113-14.

DDS additionally sought registration as a "competitive" telecommunications company, claiming it was subject to effective competition. Competitive status allows a telecom-

---

[1]The Department of Public Service was the predecessor-in-interest to the Washington Utilities and Transportation Commission. For purposes of uniformity, we will refer to both the Department of Public Service and the Washington Utilities and Transportation Commission as the "Commission".

[2]"Dark fiber" is a fiber optic cable that is provided without optronics at either end. Because it is not "lit up" with light pulses, it is called "dark" fiber.

munications company to enjoy various statutory benefits, including minimal regulation. RCW 80.36.320(2).

The Commission registered both ELI and DDS as telecommunications companies with authority to provide interexchange services throughout the state of Washington. Administrative Record (ELI) (Dec. 6, 1991), Third Supplemental Order Granting Registration Application In Part (hereafter Third Supplemental Order), at 41; Administrative Record (ELI) (Mar. 13, 1992), Fourth Supplemental Order on Motion for Partial Reconsideration and Clarification (hereafter Fourth Supplemental Order on Motion), at 1; Administrative Record (DDS) (Apr. 29, 1992), Fourth Supplemental Order Granting In Part Registration Application and Competitive Classification Petition (hereafter Fourth Supplemental Order), at 1. The Commission thereby permitted ELI and DDS to provide services to and from end users to the extent the connections involved an end user in one exchange and a terminus in another. In opening only *inter*exchange connections to competition from ELI and DDS, the Commission preserved the "exclusive" rights of LEC's to provide all "intraexchange"[3] services except dark fiber services in U S WEST Communications, Inc. (U S WEST) exchanges. Administrative Record (ELI) (Dec. 6, 1991), Third Supplemental Order, at 42; Administrative Record (DDS) (Apr. 29, 1992), Fourth Supplemental Order, at 1. The Commission also found that DDS faced effective competition in the marketplace and granted DDS's request for competitive status. Administrative Record (DDS) (Apr. 29, 1992), Fourth Supplemental Order, at 1.

Several parties, including ELI, Washington Independent Telephone Association (WITA), Whidbey Telephone Co. (Whidbey), GTE Northwest, Inc. (GTE), DDS, and Telecommunications Ratepayers Association for Cost-based and Equitable Rates (TRACER), petitioned for judicial review of

---

[3]The Commission defined "intraexchange services" to include those connections both commencing and terminating within the same "exchange". An exchange is the smallest discrete geographic area established by the Commission and serviced by a single local telephone company.

the ELI orders, and the court consolidated those petitions. Clerk's Papers, at 56-67. The same parties filed a petition for review in the DDS case, and the Superior Court consolidated the ELI and DDS cases. Clerk's Papers, at 85-90.

On November 13, 1992, the trial court issued its memorandum disposition and final order. Clerk's Papers, at 204-14. It upheld the Commission's approval of DDS's and ELI's respective applications but reversed the Commission's reservation of "exclusive" rights for LEC's on the ground the Commission lacks authority under RCW 80.36.230 to confer exclusive rights.[4] The court also awarded the Commission transcript fees in connection with the assorted petitions for judicial review.

On January 11, 1993, the trial court filed its order granting clarification and reconsideration in part. Clerk's Papers, at 308-09. After the trial court denied a motion to clarify its January 11 order, Clerk's Papers, at 325-26, WITA, Whidbey, GTE, and the Commission filed notices of appeal to this court. Clerk's Papers (WITA), at 349-66; Amended Notice of Appeal to Supreme Court; Clerk's Papers (Whidbey), at 471-86; Amended Notice of Appeal to Supreme Court (GTE) (Mar. 4, 1993); Clerk's Papers (Commission), at 385-482.

### THE COMMISSION LACKS THE AUTHORITY TO GRANT EXCLUSIVE RIGHTS TO TELECOMMUNICATIONS COMPANIES

■■ This court examines issues of law de novo. *Overton v. Economic Assistance Auth.*, 96 Wn.2d 552, 637 P.2d 652 (1981). As with all issues of statutory interpretation, the primary objective is to find the intent of the Legislature. That intent must be determined primarily from the statutory language. *State Department of Transp. v. State Employees' Ins. Bd.*, 97 Wn.2d 454, 458-59, 645 P.2d 1076 (1982).

■ An agency possesses only those powers granted by statute. *Cole v. Washington Utils. & Transp. Comm'n*, 79

---

[4]On April 20, 1993, the Commission issued orders on remand. The new orders are not before the court.

Wn.2d 302, 306, 485 P.2d 71 (1971). RCW 80.36.230 reads: "The commission is hereby granted the power to prescribe exchange area boundaries and/or territorial boundaries for telecommunications companies." This language does not confer on the Commission the power to grant monopolies or exclusive rights. Since the Commission is fully capable of exercising its authority under RCW 80.36.230 without the power to grant monopolies or other exclusive rights, the text does not necessarily or impliedly grant such power. *See In re Little*, 95 Wn.2d 545, 627 P.2d 543 (1981) (permitting an agency to exercise power where power is "necessary" to implement statutory scheme), *overruled on other grounds in State v. Danforth*, 97 Wn.2d 255, 643 P.2d 882 (1982); *Hillis Homes, Inc. v. Snohomish Cy.*, 97 Wn.2d 804, 808, 650 P.2d 193 (1982) (without express authority, action by county which is considered suspect under the Washington State Constitution is invalid, no matter how necessary it might be). The Commission therefore lacks the authority under RCW 80.36.230 to grant exclusive rights to LEC's.

Appellants suggest this holding renders the words "companies" and "and/or territorial boundaries" in RCW 80.36-.230 superfluous. See Brief of Appellant (WUTC), at 25; Brief of Cross-Appellant (Whidbey), at 17-19. This is not correct. Our interpretation of RCW 80.36.230 enables the Commission to define the geographical limits of a company's obligation to provide service on demand and to delineate the boundaries between local and long distance calling.

Even were the statute ambiguous, our state constitution makes it inappropriate to impute to RCW 80.36.230 a conferral of authority on the Commission to grant monopolies. Const. art. 12, § 19 states in relevant portion:

> Any association or corporation, or the lessees or managers thereof, organized for the purpose, or any individual, shall have the right to construct and maintain lines of telegraph and telephone within this state, and said companies shall receive and transmit each other's messages without delay or discrimination and all of such companies are hereby declared to be common carriers and subject to legislative control. . . . The legislature shall . . . provide reasonable regulations to give effect to this section.

Appellants claim the phrases "subject to legislative control" and "reasonable regulations" permit the Commission to grant monopolies. This contention is unpersuasive. The structure of the passage indicates all corporations have the right to construct lines and such corporations are subject to legislative control. The mandate that the Legislature provide reasonable regulations to protect the right of all corporations to provide telecommunications services in no way eviscerates the constitutional protection.

A second passage of the constitution likewise militates against imputing the authority to grant monopolies. Const. art. 12, § 22 states:

> Monopolies and trusts shall never be allowed in this state, and no incorporated company, copartnership, or association of persons in this state shall directly or indirectly combine or make any contract with any other incorporated company, foreign or domestic, through their stockholders, or the trustees or assignees of such stockholders, or with any copartnership or association of persons, or in any manner whatever for the purpose of fixing the price or limiting the production or regulating the transportation of any product or commodity.

Neither Const. art. 12, § 19 nor Const. art. 12, § 22 represents an absolute prohibition against monopolies. *See State ex rel. Department of Pub. Works v. Inland Forwarding Corp.*, 164 Wash. 412, 2 P.2d 888 (1931); *Kitsap Cy. Transp. Co. v. Manitou Beach-Agate Pass Ferry Ass'n*, 176 Wash. 486, 496, 30 P.2d 233 (1934) (permitting State to prohibit entry of competitor when entrance would be "inimical to the best interests of the . . . public at large"); *Chas. Uhden, Inc. v. Greenough*, 181 Wash. 412, 43 P.2d 983, 98 A.L.R. 1181 (1935). They do however manifest the state's abhorrence of monopolies. Given the constitutional protection of the right of all companies to provide telecommunications services and the constitutional proclamation against monopolies, the Legislature must expressly grant to the Commission the authority to grant monopolies before the Commission may exercise such rights.

Appellants' position is in addition inconsistent with the objective of the telecommunications act. RCW 80.36.300(5)

notes it is the state's policy to "[p]romote diversity in the supply of telecommunications services and products in telecommunications markets throughout the state". Recognizing an implicit authority to grant monopolies would frustrate this express legislative goal of assuring diversity.

Appellants rely on nontextual support in the form of legislative history, the Commission's historic stance, legislative inaction, judicial interpretations, and an Attorney General opinion to support their contention that RCW 80.36.230 authorizes the Commission to grant monopolies.

. They argue that a case decided by the Commission shortly prior to the enactment of RCW 80.36.230 illustrated the Commission's frustration over limitations in its power and proves that the Commission's desire to prescribe exclusive areas prompted the enactment of RCW 80.36.230. The case cited by appellants for this position is noteworthy, not for its lament over the Commission's inability to grant exclusive franchises, however, but for its recognition of the Commission's inability to limit an LEC's obligations to a discrete territorial area. *See Department of Pub. Serv. v. Lower Naches Tel. Co.*, Dep't of Pub. Serv. cause 7357 (1940). In a convincing dissent to the Commission's recognition of exclusive rights, Commission Chair Sharon Nelson wrote:

> It appears the real purpose of [RCW 80.36.230] was to bring some order out of the chaos associated with small independent telephone companies, to clearly delineate local and interexchange telephone calling, and to create zones for local telephone service. . . . To claim now that the statute gives incumbent providers a perpetual monopoly over all intraexchange telecommunications services currently offered by them or yet to be invented strains credulity.

Administrative Record (ELI), Order, at 61 (Chairman Nelson, dissenting).

██ Appellants recite a litany of Commission decisions which reflect the Commission's treatment of exchange areas as exclusive.[5] However, appellants confuse the LEC's' his-

---

[5]*See State Utils. & Transp. Comm'n v. Whidbey Tel. Co.*, Utils. & Transp. Comm'n Dec., cause U-86-105 (June 9, 1987) (in granting approval of application for assign-

toric enjoyment of a de facto, partial monopoly with a statutorily-authorized, de jure monopoly. In addition, although we generally accord substantial deference to agency decisions, *Impecoven v. Department of Rev.*, 120 Wn.2d 357, 363, 841 P.2d 752 (1992), we do not defer to an agency the power to determine the scope of its own authority.

Appellants further argue that despite the Commission's long-time treatment of its approval of exchanges as effective monopolies, the Legislature has never amended RCW 80.36.230. Appellants consider this legislative inaction to be evidence of legislative acquiescence. Legislative silence by itself is not dispositive. *See Bowles v. Department of Retirement Sys.*, 121 Wn.2d 52, 63, 847 P.2d 440 (1993) (an agency's actions are entitled to "greater weight" in the context of legislative silence). Furthermore, we note that the Legislature has not been silent. The Joint Select Committee on Telecommunications has expressly declared its uncertainty over whether the Commission possesses the authority to grant monopolies. *See* Joint Select Committee on

---

ment of Point Roberts local exchange area to one of three competing applicants, Commission implied that only one company should serve a local exchange area); *State Utils. & Transp. Comm'n v. Whidbey Tel. Co.*, Utils. & Transp. Comm'n Order, cause U-85-50 (June 30, 1986) (instructing three companies to "compete for the authority to serve Pt. Roberts"); *In re Inland Tel. Co.*, Utils. & Transp. Comm'n Order, cause U-83-60, at 2 (Aug. 1, 1984) (Commission's commitment to allowing only one LEC to serve a particular area was apparent in its stated task of determining "which, if any, of the three applicants should be granted permission to establish an exchange area in . . . unassigned territory"); *In re Veatch*, Utils. & Transp. Comm'n Order, cause U-73-40 (May 16, 1974) (in noting that the Commission had never compelled one telephone company to sell a part of its territory to another telephone company, where adequate service was provided, the Commission strongly implied that territory is protected as exclusive unless service is inadequate); *Logan v. Peoples Tel. Co.*, 54 P.U.R.3d 268 (Ala. Pub. Serv. Comm'n 1964) (noting that an LEC had "exclusive authority" to furnish a community with local telephone services); *Washington Pub. Serv. Comm'n v. Mashell Tel. Co.*, Pub. Serv. Comm'n Order, cause U-8723 (Sept. 10, 1954) (dismissing a complaint to declare territory served by Mashell Telephone Company open to service by other companies since Mashell was willing and able to provide adequate service); *Clyde Tel. Co. v. Prescott Tel. & Tel. Co.*, Pub. Serv. Comm'n Order, cause U-8296 (Feb. 14, 1950) (consideration of numerous petitions for changing service from a first company to a second company on a "failure to provide adequate service" standard implies that barring failure, the first company is entitled to be an exclusive provider).

Telecommunications, Washington State Legislature (Final Report), at 12 (1985) ("Washington law is not settled on whether a grant of an exchange area by the Commission constitutes an exclusive franchise").

Appellants also contend that courts in Washington have recognized the exclusivity of LEC rights. They cite *Prescott Tel. & Tel. Co. v. Utilities & Transp. Comm'n*, 30 Wn. App. 413, 418, 634 P.2d 897 (1981) and *Jewell v. Washington Utils. & Transp. Comm'n*, 90 Wn.2d 775, 777-78, 585 P.2d 1167 (1978). However, neither *Prescott* nor *Jewell* is controlling because neither squarely addressed whether the Commission possesses the authority to grant exclusive rights. *Prescott* involved two narrow issues: whether an LEC's exchange boundary was validly created; and whether the Commission acted arbitrarily and capriciously in holding that an exchange territory could not be taken away from the LEC absent a showing the LEC was unwilling or unable to provide service in the territory. It did not hold that the Commission possesses the power to grant monopoly rights to LEC's.

■ Likewise, *Jewell* addressed the narrow issue of whether charitable contributions by privately owned telephone companies should be paid by telephone users or company stockholders. The *Jewell* court assumed the companies enjoyed monopoly rights. The holding that stockholders should pay for the contributions would have applied equally however even if de jure monopoly rights were not granted. As noted, a de facto monopoly does not constitute a de jure monopoly. We do not rely on cases that fail to specifically raise or decide an issue. *In re Estate of Elliott*, 22 Wn.2d 334, 348, 156 P.2d 427, 157 A.L.R. 1335 (1945); *State ex rel. Todd v. Yelle*, 7 Wn.2d 443, 110 P.2d 162 (1941) (doctrine of stare decisis does not apply to language which is unnecessary to conclusion reached). Thus, neither *Prescott* nor *Jewell* is controlling authority for the issue presently before the court.

■ ■ Finally, in a 37-year-old opinion, the Attorney General opined the Commission possesses the authority to

prescribe exclusive areas under RCW 80.36.230. *See* AGO 223 (1956). Although Attorney General opinions are generally entitled to considerable weight, *Bowles v. Department of Retirement Sys.*, *supra*, Attorney General opinions are not controlling on this court. *Washington Fed'n of State Employees, Coun. 28 v. Office of Fin. Mgt.*, 121 Wn.2d 152, 849 P.2d 1201 (1993). Moreover, they are entitled to less deference when statutory interpretation is at issue. *Washington Fed'n of State Employees*, at 164. Given the absence of express authority in RCW 80.36.230, the constitutional protection of broad participation by telecommunications companies, the constitutional aversion to monopolies, and the Legislature's own uncertainty regarding the meaning of RCW 80.36.230, we disagree with the conclusion of the Attorney General.

We affirm the trial court's decision that the Commission is powerless to grant monopolies. Our holding does not prevent the Commission from limiting the number of LEC's or other telecommunications companies which may operate in a given territory. It does however forbid the Commission from legally conferring on any LEC the right to be the exclusive provider of telecommunications services in a given exchange.

### The Trial Courts Decision Affirming The Commissions Registration of Both ELI And DDS Is Affirmed

WITA, GTE, and Whidbey challenge the Commission's registrations of ELI and DDS on factual and legal grounds. Since we find that substantial evidence supports the Commission's factual findings and that its legal conclusions are based on the appropriate law, it is unnecessary for this court to determine whether these appellants have standing to challenge.

An administrative agency's findings of fact are governed by a substantial evidence standard. RCW 34.05-.570(3). Substantial evidence is " 'evidence in sufficient quantum to persuade a fair-minded person of the truth of

the declared premises.' " *Olmstead v. Department of Health, Med. Section*, 61 Wn. App. 888, 893, 812 P.2d 527 (1991) (quoting *Green Thumb, Inc. v. Tiegs*, 45 Wn. App. 672, 676, 726 P.2d 1024 (1986)). Thus, the Commission's factual findings with respect to ELI and DDS will be upheld if sufficient evidence would persuade a fair-minded person that the Commission's findings are correct.

WITA, GTE, and Whidbey contend ELI failed to show adequate financial resources as required by WAC 480-121-040 which provides:

> [A]n applicant must clearly show that . . . [it] possesses adequate financial resources to provide the proposed service[.]

The abundant evidence pursuant to which the Commission determined ELI met this requirement included the following: Citizens Utilities CapitalCorp (Citizens), the parent company of ELI's parent company, boasted annual revenues for the 12 months ending June 30, 1990, of $356 million with a net income of $93.7 million, Administrative Record (ELI) (Jan. 11, 1991), at 1617 (Testimony of Thomas L. Wilson, Jr.); Citizens is the only utility in the United States whose common stock has Standard & Poor's highest ranking, whose commercial paper has both Standard & Poor's and Moody's highest ratings, and whose bonds enjoy both Standard & Poor's and Moody's triple-A ratings, Administrative Record (ELI) (Sept. 7, 1990), at 1166; Citizens pledged to invest up to $10 million in ELI, Administrative Record (ELI), at 1143 (Direct Testimony of John Warta (Warta)); Administrative Record (ELI) (Jan. 11, 1991), at 1617 (Testimony of Thomas L. Wilson, Jr.); and ELI secured other financing commitments worth $11.4 million, Administrative Record (ELI), at 1143 (Warta). Also submitted under confidential seal were two pages from a Citizens Utilities CapitalCorp stock purchase agreement, concretely evidencing its commitment to the financial health and well-being of ELI. Administrative Record (ELI) (June 29, 1990), at 2023-24 (Purchase Agreement). This evidence is sufficient to persuade a fair-minded person that ELI possesses adequate financial resources.

■ WITA, GTE, and Whidbey also challenge the Commission's registration of ELI on the legal ground that ELI should not have been accorded registration in any area for which it has not submitted information to the Commission. WAC 480-121-050 is cited as support for this proposition. This provision of the WAC does not provide for regional or otherwise piecemeal registration. It merely directs applicants to provide a "[d]etailed description of the telecommunications services applicant intends to offer, designating geographic areas of operation . . .". The regulation comports with RCW 80.36.350 which likewise contemplates 1-time, statewide registration, requiring new telecommunications companies to "register with the commission before beginning operations *in this state.*" (Italics ours.) Nothing in the regulation or statute requires the Commission to limit an applicant's operating authority to the areas initially identified in a company's application. By designating geographical areas of operation in Washington as "Seattle . . . and . . . other geographical areas that may seem feasible", Administrative Record (ELI exhibits — Application for Registration), at 1160, ELI complied with the statute as well as the regulation. The Commission's grant of statewide authority to ELI was therefore proper.

DDS's registration is likewise fully supported. DDS is a wholly owned, indirect subsidiary of WestMarc Communications, Inc. (WestMarc). As part of its application, DDS provided financial reports for 3 years of WestMarc operations, each indicating the health of WestMarc. Administrative Record, at 207-330 (DDS's application with attachments exhibits C-3 through C-6). Jeffrey Roe, Vice President and General Manager of DDS, testified WestMarc would finance installations and maintenance of the network. Administrative Record (DDS), at 2255. Also submitted under confidential seal as part of DDS's application were: a WestMarc Letter of Credit, Administrative Record (DDS), at 354; DDS's Pro Forma Balance Sheet, Administrative Record (DDS), at 355; and DDS's Pro Forma Income Statement, Administrative Record (DDS), at 356. A staff

economist with the Commission testified the value of DDS's stock was "more than double" the amount he believed necessary to operate a metropolitan area telecommunications network in Seattle. Administrative Record (DDS), at 2297. This evidence is sufficient to persuade a fair-minded person that DDS met the requirements of WAC 480-121-040.

With respect to the legal question of whether statewide operating authority was properly granted, DDS, like ELI, communicated to the Commission its intention to operate initially in only a limited geographical area, i.e., the east Puget Sound area. Administrative Record (DDS's application), at 137. Like ELI, however, DDS complied with the statute and administrative regulations and its grant of statewide authority should be upheld.

 GTE challenges DDS's registration on an additional, third ground. DDS is an indirect subsidiary of TCI and has expressed its intent to lease dark fiber from TCI in the event it provides dark fiber services. GTE argues that cable companies are telecommunications companies insofar as they provide their cable, a service identified by the Commission as a telecommunications service, for eventual resale to the general public. See RCW 80.04.010 (a corporation operating facilities used to provide telecommunications for resale to the general public is a "telecommunications company"). GTE contends that because TCI has failed to register as a telecommunications company, DDS's registration, premised on its use of TCI facilities, should also fail. It is unnecessary for us to consider whether TCI must register. Even if TCI has unlawfully evaded registration, no legal support was presented for defeating registration based on a company's speculative relationship with a company which has allegedly been operating as a telecommunications company without proper authority. An appellate court need not decide a contention not supported by citation to authority. See State v. Lord, 117 Wn.2d 829, 822 P.2d 177 (1991), cert. denied, 113 S. Ct. 164 (1992). Furthermore, the proper forum for challenging TCI's operations would be one in which TCI was a party. Finally, DDS's main plan appeared to be the provision of non-dark fiber services. Its application

noted "DDS *may also* offer dark fiber . . . services . . ., depending on the particular needs and requests of customers." (Italics ours.) Administrative Record, at 140 (DDS's application with attachments exhibit A). Even absent the provision of dark fiber by TCI to DDS, approval of DDS's application was appropriate.

### The Trial Courts Decision Affirming The Commission's Grant of "Competitive" Status to DDS Is Affirmed

RCW 80.36.320(1) requires the Commission to consider various factors before classifying a company as "competitive":

> In determining whether a company is competitive, factors the commission shall consider include but are not limited to:
>
> (a) The number and sizes of alternative providers of service;
>
> (b) The extent to which services are available from alternative providers in the relevant market;
>
> (c) The ability of alternative providers to make functionally equivalent or substitute services readily available at competitive rates, terms, and conditions; and
>
> (d) Other indicators of market power which may include market share, growth in market share, ease of entry, and the affiliation of providers of services.

WITA, GTE, and Whidbey assert on two grounds that the Commission improperly granted DDS statewide competitive status. They contend that because DDS initially chose to limit the geographic scope of its "relevant market", approval should be limited to that area selected. They further claim, even assuming arguendo that the Commission may grant competitive status for a region broader than that requested in an application, insufficient evidence was presented to support statewide registration. Neither claim is persuasive.

It is true that RCW 80.36.320(1) envisions piecemeal approval of competitive status:

> The commission shall classify a telecommunications company providing service *in a relevant market* as a competitive telecommunications company if it finds, after notice and hearing, that the telecommunications company has demonstrated that the services it offers are subject to effective competition.

(Italics ours.) In anticipation of the Commission's review of DDS's application for competitive status, DDS and the Com-

mission staff each attempted to define "relevant market". DDS identified "east Puget Sound metropolitan area, including, but not limited to Seattle, Tacoma, Bellevue, and Everett" as its "relevant market". Administrative Record (DDS), at 39, 40 (amended classification petition §§ 4(a), (c)). A Commission staff economist identified the relevant market as "the market for private line and special access service" without any limitation on geographic area. Administrative Record (DDS), at 2325 (testimony of Thomas L. Wilson, Jr.).

In its approval of DDS's bid for competitive classification, the Commission identified the entire state of Washington as the relevant market. Administrative Record (DDS), at 10 (Fourth Supplemental Order). There are no restraints in the statute or regulations preventing the Commission from granting competitive status to a party for the relevant market as the *Commission* defines the relevant market. Therefore, if the Commission feels that a party has met the requirements of RCW 80.36.320(1) and WAC 480--120-022(7) for a relevant market as *it* defines the relevant market, it is free to so determine.

WITA, GTE, and Whidbey also contend that DDS failed to provide information to the Commission about the number or size of alternative providers outside of the east Puget Sound metropolitan area or obtain information as to rates, terms, or conditions for substitute services in any areas outside of those served by GTE and U S West. These appellants are correct that the burden lies with the applicant to demonstrate it faces effective competition in the relevant market. RCW 80.36.320(1); WAC 480-120-022(7). However, contrary to their assertions, the evidence offered as to competitiveness pertained to the entire state. Carl Hunt, DDS's expert witness, testified:

> DDS is a non-dominant firm that will have minimal market share, no market power, and no captive customer base. It is a price taker in this market. As a price taker, DDS will simply respond to the market price like any firm in a workable competitive market. To impose full regulation on DDS would not be in the public interest. It would make DDS less competitive,

and it would discourage entry by other potential competitive telecommunications providers.

Administrative Record (DDS), at 2211 (direct testimony of Carl E. Hunt (Hunt)). Hunt noted:

> [N]ew entrants expect to be protected from unfair competition from the dominant carrier. . . . When a regulated market is first opened to entry, the previously regulated firm still will be dominant and, left to its own [devices], will be able to exert tremendous amounts of market power. . . . New entrants will . . . have to accept whatever the market price is, which is . . . one of the basic [tenets] of workable competitive markets. Thus, firms such as DDS that enter newly-opened markets are faced with effective competition. Under such a market, consumers have reasonably available alternatives, and DDS does not have a captive customer base.

Administrative Record (DDS), at 2206-07 (Hunt). This analysis applies with equal force statewide since DDS is a new telecommunications provider in Washington and since dominant carriers (LEC's) operate throughout the state of Washington. In addition, Hunt explicitly noted that his analysis could be extended beyond the east Puget Sound area to include the entire state of Washington. Transcript of Proceedings (DDS) vol. 2, at 195 (Dec. 9, 1991).

The staff economist, Thomas Wilson, Jr., also presented evidence which was germane statewide. He noted "the LECs represent extremely viable competitors, with large amounts of facilities already in place, significant experience, and financial strength." Administrative Record (DDS), at 43 (amended classification petition § 5). Wilson commented with respect to DDS's market share:

> Conventional wisdom indicates it is zero, since it is a start-up company, and faces stiff competition from the LEC. Winning market share can be expected to be difficult for DDS. DDS can be regarded as ambitious if it thinks it can win 5% in the near future.

Administrative Record, at 2329 (testimony of Thomas L. Wilson, Jr.). As does Hunt's analysis, Wilson's analysis pertains with equal vigor statewide and is not limited to the east Puget Sound area. In fact, Wilson expressly indicated that his analysis would be applicable to the entire state of

Washington. Transcript of Proceedings (DDS) vol. 3, at
375-76 (Dec. 10, 1991).

In addition to the testimony of these two specialists in the
field, the Commission possesses, as part of its institutional
knowledge, information regarding the number and sizes of
alternative providers of service, the extent to which services
are available from alternative providers in all markets, the
ability of alternative providers to make functionally equiva-
lent or substitute services readily available at competitive
rates, the terms and conditions of alternative service, and
other indicators of market power. Its decision to accord DDS
competitive status reflects its judgment that DDS satisfied
the inquiries posed by RCW 80.36.320(1) and WAC 480-120-
-022(7). Because substantial evidence supports its ruling, we
affirm the trial court's decision affirming the Commission's
ruling.

THE TRIAL COURT PROPERLY AWARDED TRANSCRIPT
FEES TO THE COMMISSION

█ Whidbey, GTE, and WITA each initiated suit under
RCW 34.05.510 *et seq.* RCW 34.05.566(5)(b) governs remedies
under RCW 34.05.510 *et seq.* It provides for remedies "[i]n
accordance with any provision of law." RCW 80.04.170 is a
"provision of law", permitting the Commission to recover
"[t]he reasonable cost of preparing the transcript of testi-
mony taken before the commission". Whether the fee is
actually applied toward the cost of preparing the transcript
is irrelevant. *See Taylor-Edwards Warehouse & Transfer Co.
v. Department of Pub. Serv.*, 22 Wn.2d 565, 571, 157 P.2d 309
(1945). The award of transcript fees is affirmed.

ANDERSEN, C.J., and DOLLIVER, DURHAM, SMITH, GUY,
JOHNSON, and MADSEN, JJ., concur.

Reconsideration denied April 28, 1994.