[No. 24739-9-II. Division Two. July 21, 2000.]

JUAN RIOS, ET AL., *Appellants*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, ET AL., *Respondents*.

128

*Todd D. True* (of *Earthjustice Legal Defense Fund*); *J. Matthew Geyman* (of *Heller Ehrman White & McAuliffe*); and *Daniel Ford* and *Sean M. Phelan* (of *Columbia Legal Services*), for appellants.

*Christine O. Gregoire, Attorney General,* and *Elliott S. Furst, Assistant,* for respondents.

HOUGHTON, J. — Juan Farias, Juan Rios, and the class they represent claim that the Washington State Department of Labor and Industries should have promulgated a regulation requiring medical monitoring of pesticide handlers. They appeal from the trial court's denial of their declaratory judgment petition. We reverse.

## FACTS

The plaintiffs in this action are a class of pesticide

handlers (pesticide handlers) who want the Department of Labor and Industries (L&I) to adopt a rule mandating a blood-testing program to monitor their exposure to certain cholinesterase-inhibiting pesticides; namely, organophosphate and carbamate compounds, which are the most widely used pesticides on Washington crops.[1] These pesticides lower the level of the cholinesterase enzyme in the blood and, thereby, prohibit the breakdown of the neurotransmitter acetylcholine, seriously affecting the nervous system.

Acute poisoning can cause muscle spasms, difficulty thinking, loss of consciousness, seizures, cessation of breathing, and death. Acute poisoning also can cause long term effects, including (1) a dying back of the nerves resulting in loss of motor function, paralysis, and muscle atrophy; (2) loss of intellectual functioning including impaired concentration, information processing, psychomotor speed, memory, and language; and (3) neurobehavioral effects including anxiety, irritability, and depression.

Major studies show that "the great majority of systemic poisonings and deaths in farm workers reported nationally and internationally have been attributed to cholinesterase-inhibiting compounds." CHOLINESTERASE MONITORING, Clerk's Papers at 277. Early signs of overexposure to these pesticides are difficult or impossible to detect without cholinesterase monitoring because the early symptoms are also consistent with other causes.

Since 1974, California has required blood cholinesterase monitoring for farm workers who regularly handle certain cholinesterase-inhibiting pesticides. Subsequently, at least two studies have been done on the cholinesterase levels of pesticide handlers in California. A 1989 study of 542 pesticide handlers found 23 percent of pesticide handlers had been overexposed to cholinesterase-inhibiting pesticides. A

---

[1] MARY MILLER & MATT KEIFER, CHOLINESTERASE MONITORING IN WASHINGTON STATE (Report from the Technical Advisory Group of the Department of Labor and Industries, 1995), at Clerk's Papers 271-91 (hereinafter CHOLINESTERASE MONITORING).

more recent, though smaller scale, study showed that about 24 percent of workers had cholinesterase levels below the California threshold.

A study of farm worker cholinesterase levels in Washington showed fewer workers, about 10 percent, with cholinesterase levels below the California threshold. But there may have been methodological problems with the study as the record also contains testimony that the risk of poisoning is greater in Washington than California because Washington's pesticide handling regulations are less stringent than California's.

The pesticide handlers first requested that L&I require this testing in April 1986. The request was renewed in 1991. In response, L&I initiated rule making and investigation. In March 1993, L&I adopted WAC 296-306-40011 (1993), recommending a nonmandatory cholinesterase monitoring program for pesticide handlers.

After receiving notice from the pesticide handlers that they would seek judicial review of the agency's failure to adopt a mandatory cholinesterase monitoring program, L&I set up a Technical Advisory Group on cholinesterase monitoring in 1993. In August 1995, the group issued a report recommending monitoring for certain pesticide handlers. L&I did not alter the nonmandatory character of the monitoring rule despite a renewed request from the farm workers in April 1997. In response, the pesticide handlers filed this class action for declaratory judgment in October 1997.

The trial court denied the pesticide handlers' motion for declaratory judgment and the pesticide handlers sought discretionary review by the Supreme Court. The Supreme Court declined review and transferred the matter to this court.

## ANALYSIS

The pesticide handlers claim that L&I should have adopted a rule mandating cholinesterase monitoring for

pesticide handlers. They rely upon the state constitution and the Washington Industrial Safety and Health Act of 1973 (WISHA). The state constitution provides that "[t]he [L]egislature shall pass necessary laws for the protection of persons working in mines, factories and other employments dangerous to life or deleterious to health[.]" WASH. CONST. art. II, § 35.[2] In response to this mandate, the Legislature enacted WISHA. *See* RCW 49.17.010. The pesticide handlers specifically rely upon WISHA sections RCW 49.17-.050(4) and RCW 49.17.240(2).

The pesticide handlers contend that L&I's failure to adopt cholinesterase monitoring requirements is reviewable under the Washington Administrative Procedures Act (APA), chapter 34.05 RCW; specifically, they invoke subsections (2) and (4) of RCW 34.05.570. Subsection (2) provides that any agency rule may be judicially reviewed by petition for declaratory judgment. RCW 34.05.570(2). Subsection (4)(b) provides: "A person whose rights are violated by an agency's failure to perform a duty that is required by law to be performed may file a petition for review pursuant to RCW 34.05.514, seeking an order pursuant to this subsection requiring performance." RCW 34.05.570(4)(b).

L&I counters that we need not reach the merits of the pesticide handlers' claims because they are not reviewable under either section. L&I first argues that RCW 34.05-.570(2) is inapplicable because no rule has been made; second, that RCW 34.05.570(4) does not allow review of a decision not to promulgate a rule. And, third, even if RCW 34.05.570(4) applied, it is unavailable to the class because the class did not exhaust its administrative remedies. Thus, we first address reviewability.

---

[2] Because the pesticide handlers never develop this argument in their briefs and because we resolve this matter on statutory grounds, we do not address this argument. Also, our statutory analysis obviates the need to address the pesticide handlers' claim under Title VI that failure to implement a cholinesterase monitoring program has discriminatory effects on Latino pesticide handlers.

## Reviewability under RCW 34.05.570(2)

L&I argues the nonmandatory provision, now codified at WAC 296-307-14520, is not a rule as defined by the APA and may not be judicially reviewed under RCW 34.05.570(2). *See* RCW 34.05.010(16).[3] But the pesticide handlers urge a broader definition of "rule" in the context of judicial review. They ask us to consider all the rules promulgated under the pesticide rule-making sections and determine whether mandatory cholinesterase monitoring should have been instituted.

The pesticide handlers cite *Consumers Union of the United States, Inc. v. FTC*, 801 F.2d 417, 422 (D.C. Cir. 1986). There, the union sought review of used car sales regulations. The union was troubled by the omission from the final regulation of a requirement that known defects be listed on the car's sales sticker. The court reviewed the omission, rejecting the FTC's argument that the omission was a decision not to engage in rule making:

> When an agency has declined entirely to enter a particular arena of regulation its discretionary judgment as to where its administrative and enforcement resources should best be expended is prominently involved. That is not the case where the agency merely fails to include in a final rule a proposed provision that is closely related to the provisions that are adopted. The latter case, which is what we have here, has never

---

[3] The APA definition, in relevant part, provides:

"Rule" means any agency order, directive, or regulation of general applicability (a) the violation of which subjects a person to a penalty or administrative sanction; (b) which establishes, alters, or revokes any procedure, practice, or requirement relating to agency hearings; (c) which establishes, alters, or revokes any qualification or requirement relating to the enjoyment of benefits or privileges conferred by law; (d) which establishes, alters, or revokes any qualifications or standards for the issuance, suspension, or revocation of licenses to pursue any commercial activity, trade, or profession; or (e) which establishes, alters, or revokes any mandatory standards for any product or material which must be met before distribution or sale. The term includes the amendment or repeal of a prior rule[.]

RCW 34.05.010(16).

been thought to present an issue of agency refusal to adopt a rule but rather an issue of the rationality of the rule it did adopt, given the alternatives that were suggested and rejected. *Consumers Union*, 801 F.2d at 422.

■ L&I has engaged in extensive rule making and investigation in the arena of pesticide regulation. *See* WAC 296-307-107 through 296-307-14520. Specifically, it has considered cholinesterase testing. L&I's decision not to include a mandatory cholinesterase-testing program may be reviewed as a rule under RCW 34.05.570(2). The rule for review is chapter 296-307 WAC, Parts I-J. Because L&I engaged in rule making and promulgated this chapter on pesticide regulation, the chapter's appropriateness in light of the WISHA provisions is subject to review. *See Consumers Union*, 801 F.2d at 422.

*Reviewability Under RCW 34.05.570(4)*

The pesticide handlers also seek judicial review under RCW 34.05.570(4)(b), asserting that L&I failed to perform a duty required by law when it failed to provide for mandatory cholinesterase testing of pesticide handlers. L&I counters that an agency's decision not to promulgate a rule is not subject to judicial review under that statute. L&I argues that the statute by its terms applies only to agency action, and the definition of agency action in RCW 34.05.010(3) does not include the determination not to promulgate a rule.

■ L&I's reading of RCW 34.05.010(3) is only partially correct. The definition does not include a determination not to regulate. Yet RCW 34.05.570(4)(b) specifically allows review of an agency's failure to perform a legally required duty and RCW 34.05.570(4)(c) effectively defines this failure or inaction as *action* for the purposes of review under RCW 34.05.570(4).

■ L&I's argument is thus reduced to a claim that review under RCW 34.05.570(4)(b) of an agency's inaction does not encompass review of an agency's failure to issue a

rule. L&I offers no case law for this distinction, which is also unsupported by a plain reading of the statute. Instead, RCW 34.05.330 allows an interested party to petition for the adoption, repeal, or amendment of a rule. It also allows an agency's decision not to repeal or amend to be appealed to a committee and then to the governor. L&I argues that RCW 34.05.330 is the exclusive remedy for a party seeking to compel an agency to adopt a rule.

Again, L&I cites no authority for its position. Neither statute nor case law provides that the availability of RCW 34.05.330 precludes use of RCW 34.05.570(4). By its terms, the RCW 34.05.330 appeal process applies only to petitions for repeal or amendment of a rule, not for adoption. RCW 34.05.330(2), (3). Thus, the administrative or executive appeal process is inapplicable here. Additionally, RCW 34.05.534(1) provides that judicial review may be sought without prior resort to RCW 34.05.330. RCW 34.05.534(1) applies specifically to RCW 34.05.570(2) appeals, but the larger implication is that RCW 34.05.330 is not an exclusive remedy for those seeking judicial review in matters concerning rules.[4]

Contrary to L&I's assertions, there is nothing in the APA suggesting that the Legislature does not allow judicial review of an agency's refusal to promulgate rules.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES UNDER RCW 34.05.570(4)

L&I also argues that the issue is not reviewable under RCW 34.05.570(4) because the pesticide handlers have failed to exhaust the administrative remedy provided in RCW 34.05.330.

Generally, a party must exhaust all available administrative remedies prior to seeking relief in court. *Citizens for Mount Vernon v. City of Mount Vernon*, 133 Wn.2d 861, 866, 947 P.2d 1208 (1997). In pertinent part, the APA's exhaustion statute provides:

---

[4] *See* EXHAUSTION OF ADMINISTRATIVE REMEDIES UNDER RCW 34.05.570(4), *infra*, at 134-35.

A person may file a petition for judicial review under this chapter only after exhausting all administrative remedies available within the agency whose action is being challenged, or available within any other agency authorized to exercise administrative review, except:

(1) A petitioner for judicial review of a rule need not have participated in the rule-making proceeding upon which that rule is based, have petitioned for its amendment or repeal, have petitioned the joint administrative rules review committee for its review, or have appealed a petition for amendment or repeal to the governor;

(2) A petitioner for judicial review need not exhaust administrative remedies to the extent that this chapter or any other statute states that exhaustion is not required[.]

RCW 34.05.534.

█ A formal petition for rule making under RCW 34-.05.330 was not required in this case before the pesticide handlers could seek review of L&I's failure to perform a duty required by law. There is no indication in the APA's statutory scheme that a rule-making petition is a remedy. Petitioning for rule making is permissive, not mandatory: the word *may*, not *shall*, is used. *See* RCW 34.05.330(1). And, more importantly, RCW 34.05.534 suggests that the petition is not a remedy that must have been exhausted because it pointedly does not require that a petitioner first petition the agency for rule making. *See* RCW 34.05.534(1). Therefore, a rule-making petition is not an exhaustible remedy when a judicial review petition under RCW 34.05.570(4) is, like the present one, challenging an agency's failure to make a rule required by law.[5] Having determined that the agency inaction is reviewable, we next turn to the standard of review.

---

[5] L&I provides no applicable authority to the contrary. It relies upon *Auer v. Robbins*, 519 U.S. 452, 459, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997). *Auer* is not controlling here for several reasons. It is sufficient to note that the federal APA's exhaustion statute does not have a provision comparable to RCW 34.05.534(1). *See* 5 U.S.C. § 704.

STANDARDS OF REVIEW AND RELIEF AVAILABLE

## *Generally*

As a general matter, the burden of demonstrating the invalidity of L&I's conduct rests on the pesticide handlers. RCW 34.05.570(1)(a). Additionally, this "court shall grant relief only if it determines that a person seeking judicial relief has been substantially prejudiced by the action complained of." RCW 34.05.570(1)(d).

## *Under RCW 34.05.570(2)*

As explained above, we review whether L&I's chapter 296-307 WAC, Parts I-J, is a rule that should have included a requirement of mandatory cholinesterase testing. When reviewing a rule, the APA provides that "the court shall declare the rule invalid only if it finds that: The rule violates constitutional provisions; the rule exceeds the statutory authority of the agency; the rule was adopted without compliance with statutory rule-making procedures; or the rule is arbitrary and capricious." RCW 34.05-.570(2)(c).

██ If we determine that the rule is invalid for failure to comply with WISHA requirements, we may order L&I to take the action required by law. *See* RCW 34.05.574(1)(b).

## *Under RCW 34.05.570(4)*

As explained above, we may review whether L&I's failure to adopt a cholinesterase-monitoring rule is a failure to perform a duty required by law to be performed.

Relief for persons aggrieved by the performance of an agency action, including the exercise of discretion, or [an agency's failure to perform a duty required by law] can be granted only if the court determines that the action is:

(i) Unconstitutional;

(ii) Outside the statutory authority of the agency or the

authority conferred by a provision of law;

(iii) Arbitrary or capricious; or

(iv) Taken by persons who were not properly constituted as agency officials lawfully entitled to take such action.

RCW 34.05.570(4)(c). Although it may seem odd that the pesticide handlers' claim that L&I's *failure* to act can *exceed* statutory authority, this is explained and permitted by the corresponding peculiarity in RCW 34.05.570(4)(b), which provides that an agency's "failure to perform a duty that is required by law to be performed" may be reviewed to determine if the *action* is "[o]utside the statutory authority of the agency." RCW 34.05.570(4)(c)(ii). If L&I failed in a legal duty, a court may issue an order requiring performance. RCW 34.05.570(4)(b); RCW 34.05.574(1)(b).

## L&I's Duty and Discretion

Because L&I's failure to promulgate a rule requiring cholinesterase monitoring is reviewable under the APA, the question becomes whether L&I was required by WISHA to promulgate such a rule.

The pesticide handlers argue: WISHA contains mandatory language requiring implementation of medical monitoring when monitoring is feasible and appropriate.

Specifically, the pesticide handlers cite the following passages:

[T]he director [of L&I] *shall*: . . . [p]rovide for the promulgation of health and safety standards[6] and the control of conditions in all work places concerning gases, vapors, dust, or other airborne particles, toxic materials, or harmful physical agents which shall set a standard which most adequately assures, to the extent *feasible*, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure

---

[6] "The term 'safety and health standard' means a standard which requires the adoption or use of one or more practices, means, methods, operations, or processes reasonably necessary or appropriate to provide safe or healthful employment and places of employment." RCW 49.17.020(7).

to the hazard dealt with by such standard for the period of his working life; any such standards shall require *where appropriate* the use of protective devices or equipment and for monitoring or measuring any such gases, vapors, dust, or other airborne particles, toxic materials, or harmful physical agents[.]

RCW 49.17.050(4) (emphasis added).

*Where appropriate*, such [safety and health standards] . . . *shall* provide for monitoring or measuring employee exposure at such locations and intervals, and in such manner as may be *reasonably necessary* for the protection of employees. In addition, *where appropriate*, any such rule *shall* prescribe the type and frequency of medical examinations or other tests which *shall* be made available, by the employer or at his cost, to employees exposed to such hazards in order to most effectively determine whether the health of such employees is adversely affected by such exposure.

RCW 49.17.240(2) (emphasis added).

■ The issues surrounding challenges to an administrative agency's under-regulation are of first impression in Washington.[7] Federal precedent interpreting the Occupational Safety and Health Act (OSHA) may be useful when construing similar provisions in WISHA, *Adkins v. Aluminum Co. of America*, 110 Wn.2d 128, 147, 750 P.2d 1257 (1988), but is not controlling. *See Aviation W. Corp. v. Dep't of Labor & Indus.*, 138 Wn.2d 413, 424, 980 P.2d 701 (1999). In comparing OSHA and WISHA, we note that they are significantly different. The lengthy subsection in OSHA authorizing the Secretary to implement regulations begins with the permissive "may." 29 U.S.C. § 655 (b).[8] On the other hand, as the pesticide handlers correctly note, the WISHA provisions at issue use the mandatory *shall* and do not use the permissive *may*. *See* RCW 49.17.050; RCW 49.17.240.

---

[7] There are federal Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-678, cases involving worker claims of under-regulation. *See, e.g., Bldg. & Constr. Trades Dep't v. Brock*, 838 F.2d 1258 (D.C. Cir. 1988).

[8] "The Secretary *may* by rule promulgate, modify, or revoke any occupational safety or health standard in the following manner: . . . ." 29 U.S.C. § 655(b) (emphasis added).

L&I cites several federal cases in support of its position that its regulation under WISHA is discretionary and not compelled by statutory requirements. But given the difference in word choice between OSHA and WISHA, the federal cases provide little guidance.

 The use of "shall" indicates an imperative. *See, e.g., Wash. State Coalition for the Homeless v. Dep't of Soc. & Health Servs.*, 133 Wn.2d 894, 907-08, 949 P.2d 1291 (1997); *Erection Co. v. Dep't of Labor & Indus.*, 121 Wn.2d 513, 518, 852 P.2d 288 (1993); *Waste Mgmt. of Seattle, Inc. v. Wash. Utils. & Transp. Comm'n*, 123 Wn.2d 621, 629, 869 P.2d 1034 (1994). Contrary to L&I's assertions, the WISHA term "appropriate" does not give unlimited discretion to the agency, nor does it severely limit judicial review. L&I's interpretation renders the statutory term "shall" meaningless. The WISHA provisions at issue place a mandatory duty on L&I: if cholinesterase monitoring is appropriate, feasible, and reasonably necessary for the protection of workers, L&I must adopt a standard. *See* RCW 49.17.050(4), .240(2), .020(7).

## The Limits of Discretion

 Agencies have discretion in the manner in which they carry out their mandatory duties. But it is the Legislature that determines what those duties will be. In enacting WISHA, the Legislature identified certain duties for L&I. One of those duties is to establish medical monitoring programs that are feasible and appropriate.

In carrying out this and other legislatively mandated duties, L&I has procedural discretion. But an agency's procedural discretion does not allow it to decide not to carry out a mandatory duty imposed by the Legislature. L&I erroneously interprets the WISHA provisions as granting it authority to impose or decline to impose a duty on itself. This interpretation is untenable. Because the question goes to the extent of the agency's authority and responsibility,

L&I's interpretation of the statute is not entitled to deference. *In re Registration of Elec. Lightwave, Inc.*, 123 Wn.2d 530, 540, 869 P.2d 1045 (1994).

Recently, our Supreme Court considered the duty and discretion of agencies. The cases of *Hillis v. Department of Ecology*, 131 Wn.2d 373, 932 P.2d 139 (1997), and *Coalition*, 133 Wn.2d 894, describe the interrelationship of agency duty and agency discretion.

In *Hillis*, the plaintiff, after waiting several years for his applications for groundwater rights to be processed, filed a lawsuit against the State Department of Ecology (DOE) to compel processing. *Hillis*, 131 Wn.2d at 377-80. DOE agreed it had a statutory duty to process water permit applications. *Hillis*, 131 Wn.2d at 385. But DOE claimed that because it had discretion to establish a schedule for carrying out its duties, its action was not arbitrary and capricious as it resulted from funding limitations placed on it by the Legislature. *Hillis*, 131 Wn.2d at 385.

The Supreme Court agreed and held that given DOE's budget limitations, DOE's schedule for carrying out its recognized duties was not arbitrary and capricious as DOE had procedural discretion in the manner in which it carried out its statutory duties. *Hillis*, 131 Wn.2d at 390-94. And, the court held it could consider the funding available in exercising that discretion.

But in *Coalition*, 133 Wn.2d 894, the Coalition claimed that a statute required the Department of Social and Health Services (DSHS) to care for homeless children.[9] DSHS denied that the statute at issue, despite its mandatory language, created such a duty. *Coalition*, 133 Wn.2d at

---

[9] That statute, prior to its 1999 amendment, in pertinent part, read:

The department [of Social and Health Services] shall have the duty to provide child welfare services and shall:

(1) Develop, administer, supervise, and monitor a coordinated and comprehensive plan that establishes, aids, and strengthens services for the protection and care of homeless, runaway, dependent, or neglected children.

Former RCW 74.13.031 (1998).

907. Further, DSHS had no schedule for carrying out its duties under the statute because it denied the existence of those duties. *Coalition*, 133 Wn.2d at 911.

The Supreme Court disagreed with DSHS, holding that the statute created a mandatory duty. *Coalition*, 133 Wn.2d at 908. "While the Department is afforded discretion under the statute in developing the plan required, it must comply with the clear language of the statute when it exercises that discretion[.]" *Coalition*, 133 Wn.2d at 912. Whether DSHS had exercised its procedural discretion under the statute in a manner not arbitrary and capricious was simply not at issue. DSHS could not claim to be acting within its discretion when it denied the very existence of its duties. Thus, the *Coalition* court held that agencies must comply with mandatory legislative directives and *Hillis* explains that agencies have discretion in the manner in which they carry out those duties.

Because agency duties include the duty to engage in rule making, agencies have discretion in rule making. For instance, L&I has procedural discretion in the manner in which it conducts rule making under WISHA. Provided it does not act in an arbitrary and capricious manner, L&I has discretion to schedule and prioritize its rule-making process, in accordance with available funding and other relevant and appropriate factors.[10] *See Hillis*, 131 Wn.2d at 390-94. The discretion to schedule and prioritize rule making necessarily includes the discretion to schedule a time to determine whether a proposed regulation is appropriate, reasonably necessary and feasible.

But once L&I investigates and compiles evidence showing that a proposed regulation under WISHA is appropriate, reasonably necessary, and feasible, L&I no longer has

---

[10] This discretion is limited somewhat by RCW 34.05.330, which permits a party to petition an agency for rule making, although the schedule by which the agency processes the petition may be affected by budgetary limitations. *See Hillis*, 131 Wn.2d at 390-94.

discretion. The mandatory language of WISHA requires L&I to promulgate a regulation.[11]

*The Regulatory Floor: The Meaning of Appropriate and Reasonably Necessary*

Recently, the Supreme Court considered the terms "appropriate" and "reasonably necessary" within the context of an over-regulation claim. *See Aviation W. Corp.*, 138 Wn.2d 413. The court considered and rejected the federal test for evaluating workplace regulation. *Aviation*, 138 Wn.2d at 422-34 (discussing *Industrial Union Department v. American Petroleum Institute (Benzene)*, 448 U.S. 607, 100 S. Ct. 2844, 65 L. Ed. 2d 1010 (1980) (plurality opinion)). For a regulation to be valid, that test requires a showing of a significant risk of material health impairment and a showing that the proposed regulation was reasonably necessary and appropriate to remedy the risk. *Aviation*, 138 Wn.2d at 423 (citations omitted).

The court held that the *Benzene* significant risk test set the ceiling for regulation too low because WISHA provides worker protection that equals *or exceeds* federal standards. *Aviation*, 138 Wn.2d at 423-24. The court noted that L&I is required to regulate in a manner " 'which most adequately assures . . . that *no* employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life.' RCW 49.17.050(4) (emphasis added)." *Aviation*, 138 Wn.2d at 431-32. The court held that the *Benzene* significant risk test renders this language superfluous. *Aviation*, 138 Wn.2d at 432. Provided the agency considers the "best available science," the court granted L&I a much higher ceiling for

---

[11] In promulgating a regulation, L&I must adhere to RCW 34.05.328. That section requires, inter alia, that the agency "[d]etermine that the probable benefits of the rule are greater than its probable costs, taking into account both the qualitative and quantitative benefits and costs and the specific directives of the statute being implemented." RCW 34.05.328(1)(c). As stated, the specific directives of the WISHA provision here are mandatory.

regulation: "Whether regulations are reasonable or appropriate is a question for the fact finder to determine on a case-by-case basis, subject to only limited review by this court." *Aviation*, 138 Wn.2d at 432.

The present case concerns the floor, not the ceiling, for regulation; thus, the *Aviation* opinion is not directly on point. L&I argues that the floor for regulation should also be a fact question, subject only to limited review. *See Aviation*, 138 Wn.2d at 432. But this conclusion in *Aviation* followed from WISHA's broad mandate to protect the health of every worker. To allow such latitude to an agency's under-regulation would not keep with WISHA's mandate.

■ Where the floor for regulation is set is also an issue of first impression. Guidance may be found in the *Aviation* court's comment that "common sense would compel a conclusion that it would generally not be 'reasonably necessary or appropriate' to regulate an *insignificant* risk[.]" *Aviation*, 138 Wn.2d at 433. Thus, it is appropriate and reasonably necessary to regulate significant risks. This floor for regulation follows: L&I must regulate if its own investigation shows a significant risk that can be materially reduced by a feasible health and safety standard.[12]

Therefore, we review the record to determine if cholinesterase monitoring is a feasible standard that can materially reduce a significant risk to pesticide handlers. In this review, "feasible" is given its dictionary definition: capable of being achieved. *See Aviation*, 138 Wn.2d at 433 n.11. The definition of significant risk requires case-by-case determination.[13]

---

[12] That the showing be from the agency's own investigation is necessary to safeguard L&I's discretion to schedule its investigation and rule making.

[13] "A fatality risk of one in a billion 'clearly' would not be significant, while a risk of one in a thousand 'might' be." *Aviation*, 138 Wn.2d at 425 (citing *Benzene*, 448 U.S. at 655). Such is the *Benzene* Court dictum on what would constitute a significant risk in the context of a regulatory ceiling. *See id.* Because the present case concerns the regulatory floor, significant risk should entail greater danger than in the *Benzene* dictum.

*The Necessity of a Cholinesterase-Monitoring Standard*

 L&I does not strenuously contest that pesticide handlers face significant risks or that a mandatory cholinesterase program would materially reduce these risks. In fact, L&I concedes that pesticide exposure poses a significant risk to agricultural pesticide handlers. L&I's Dr. Michael Silverstein stated:

> I believe that farm workers need better protection from pesticides, and that cholinesterase monitoring is a valuable method for enhancing these protections, which should be made available to exposed workers. I also believe it unlikely that all agricultural employers will provide the benefits of medical monitoring to farm workers without a mandatory rule.

Clerk's Papers at 490. L&I's own investigation amply demonstrates that cholinesterase monitoring is a feasible standard that can materially reduce a significant risk to workers who handle pesticides.

Both the likelihood of pesticide poisoning and the severity of harm from poisoning indicate the significant risk involved. As already noted, poisoning causes very severe neurological problems, both acute and chronic.

Not only are the effects severe, but also the likelihood of pesticide poisoning is significant. "[T]he great majority of systemic poisonings and deaths in farm workers reported nationally and internationally have been attributed to cholinesterase-inhibiting compounds." CHOLINESTERASE MONITORING, Clerk's Papers at 277. Statistics from California suggest that nearly one in four pesticide handlers have cholinesterase levels below that considered safe. Danger to nearly 25 percent of workers is a significant risk, and is heightened if, as testified, the risk of poisoning is greater in Washington than California.[14]

Monitoring in California has been successful in materially reducing the number of work-related illnesses. And, as

---

[14] Even if only the Washington study is considered, the 10 percent of workers it identifies with below threshold cholinesterase demonstrates a significant risk.

the L&I Technical Advisory Group concluded, "a well run cholinesterase monitoring system carried out by an employer could be of significant benefit in identifying overexposure and preventing poisonings." CHOLINESTERASE MONITORING, Clerk's Papers at 272.

Finally, the record demonstrates that a cholinesterase-monitoring standard is feasible—capable of being done. Since 1974, California has required monitoring for farm workers who regularly handle cholinesterase-inhibiting pesticides. And the existence of Washington's voluntary cholinesterase-monitoring provision indicates a standard's feasibility.

Because L&I's own investigative process shows that cholinesterase monitoring is a feasible standard that can materially reduce a significant risk to worker health, L&I has a statutory duty to promulgate a standard. Although L&I has discretion in the manner in which it carries out this statutory duty, a court can order L&I to promulgate a cholinesterase-monitoring rule in some circumstances.[15] *See* RCW 34.05.574(1)(b).

L&I has discretion, limited somewhat by RCW 34.05.330, in deciding when and in what areas to initiate investigation for rule making. L&I also has discretion in determining exactly how a regulation will be crafted. But if, as in this case, agency investigation reveals that a proposed WISHA regulation will materially reduce a significant risk, L&I may not decide not to regulate. The mandatory language of WISHA requires regulation.

Reversed and remanded for further proceedings.

ARMSTRONG, C.J., and BRIDGEWATER, J., concur.

Review granted at 142 Wn.2d 1024 (2001).

---

[15] L&I cannot claim to have exercised this discretion and adopted a nonmandatory provision because a nonmandatory provision is not a standard under WISHA. RCW 49.17.020(7).